Jules LUSARDI, et al.

v.

XEROX CORPORATION, a New York Corporation.

Civ. A. No. 83–809.

United States District Court, D. New Jersey.

Nov. 5, 1987.

John F. Geaney, Steven J. Adler, Cole, Geaney, Yamner & Byrne, Paterson, N.J., Robert L. Deitz, Perkins, Coie, Washington, D.C., Robert H. Jaffe, Lorraine E. Stanley, Jaffe & Schlesinger, Springfield, N.J., Alan S. Weitz, Hilary Harp, Ginsburg, Feldman and Bress, Washington, D.C., for plaintiffs.

Robert J. Del Tufo, Hannoch, Weisman, Roseland, N.J., Peter W. Marshall, Gen. Counsel, Alfred H. Hoddinott, Jr., Asst. Gen. Counsel, Xerox Corp., Stamford, Conn., Fred A. Freund, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant Xerox Corp.

## OPINION

LECHNER, District Judge.

## CONTENTS

| | | Page No. |
|---|---|---|
| I. | Preliminary Statement | 352 |
| II. | Procedural History | 353 |
| III. | Facts | 354 |
| | A. The Xerox Business History and Reductions in the Workforce | 354 |
| | B. The Downsizing Process | 356 |
| | C. Facts Concerning the Sample Group from the Conditional Class | 357 |
| IV. | Discussion | 358 |
| | A. ADEA Similarly Situated Requirement | 358 |
| | B. Other Decisions Concerning the Similarly Situated Standard | 359 |
| | C. The Instant Action | 361 |
| | D. Defenses to ADEA Claims | 363 |
| |   1. For Good Cause | 364 |
| |   2. Bona Fide Occupational Qualification | 365 |
| |   3. Business Necessity | 365 |
| |   4. Bona Fide Employee Seniority System | 367 |
| |   5. Bona Fide Employee Benefit Plans | 368 |
| |   6. Waiver | 369 |
| | E. Fairness and Procedural Considerations | 370 |
| | F. ADEA Filing Requirements | 376 |
| V. | Conclusion | 379 |

## I. PRELIMINARY STATEMENT

This case was brought against Xerox Corporation ("Xerox") for alleged violations of the Age Discrimination in Employment Act ("ADEA")[1] in connection with various work force reductions. Plaintiffs' previous request to proceed as a class was conditionally granted, pending notice to potential class members and discovery on the composition of the potential class. The discovery has been completed and, based upon the information obtained, Xerox has moved to decertify the conditional class. Plaintiffs have filed a cross-motion for summary judgment or, in the alternative, for a presumption of class-wide liability. Also before the court is plaintiffs' motion to strike the Xerox expert report. Because it appears the members of the proposed class come from different departments, groups, organizations, suborganizations, units and local offices, as well as different subsidiaries of Xerox, performed different jobs at different geographic locations, were the subject of different job actions concerning reductions in the Xerox work force (including resignations, promotions, terminations for cause, etc.) which occurred at various times as a result of decisions by different supervisors made on a decentralized employee-by-employee basis, plaintiffs are not similarly situated. Accordingly, for the reasons set forth below, the Xerox motion to decertify is granted. Plaintiffs' motions

1. 29 U.S.C. § 621 et seq. (1985).

for summary judgment and concerning the Xerox expert report are moot.

## II. PROCEDURAL HISTORY

A Class Action Complaint was filed against Xerox on March 8, 1983 by four former Xerox employees who had held positions with the Office Products Division of Xerox ("OPD").[2] Plaintiffs alleged violations of the ADEA and individual common law causes of action. A First Amended Complaint was filed on March 24, 1983, wherein plaintiffs sought certification of all persons between the ages of forty and seventy

> who since May 1, 1980 had applied for employment in a salaried position with any unit, division or American subsidiary of Xerox Corporation and were rejected for available openings or who were in a salaried position with any unit, division or American subsidiary of Xerox Corporation and were terminated and/or forced to accept early retirement instead of being promoted to or retained to fill available openings.

(First Amended Complaint, ¶ 13.)

On June 1, 1983, Xerox filed a motion to strike those allegations of the First Amended Complaint which (1) sought to utilize Rule 23, Fed.R.Civ.P., for certification of the proceeding as a class action; (2) alleged the named plaintiffs were appropriate representatives of applicants or of salaried employees outside the OPD; and (3) sought to assert pendent state law claims. Xerox also sought dismissal of the First Amended Complaint in its entirety on the ground

plaintiffs had failed to exhaust administrative remedies. Plaintiffs concurrently moved for class certification of the ADEA claims under Rule 23, Fed.R.Civ.P., or alternatively under section 7(b) of the ADEA, 29 U.S.C. § 626(b) (1985).[3]

The Honorable Herbert J. Stern denied the Xerox motion to dismiss because he found the named plaintiffs had commenced state proceedings within the meaning of 29 U.S.C. § 633(b), and "[o]nce these state proceedings were terminated, plaintiffs were entitled to pursue their remedies in a federal forum." *Lusardi v. Xerox Corp.,* 99 F.R.D. 89, 91 (D.N.J.1983) (footnote omitted). Judge Stern held the class could not be certified pursuant to Rule 23, but could go forward as a class action under the authority of section 7(b) of the ADEA and section 16(b) of the Fair Labor Standards Act ("FLSA"). *See* 99 F.R.D. at 93. The court directed notice be sent to the so-called "similarly situated" class members, which was done in February, March and April, 1984, and set up a discovery period in order to determine the actual number of persons similarly situated to the named plaintiffs. *See id.* at 93, n. 8. The court deferred action on the pendent state law claims.[4]

On January 31, 1984, Judge Stern entered an Order conditionally certifying a class (the "Conditional Certification Order") consisting of:

> All salaried employees in the forty (40)— seventy (70) age group who in the period May 1, 1980 through March 31, 1983 have been terminated or required to retire from employment at an age less than

**2.** The four originally named plaintiffs are Messrs. Lusardi, Weiss, Hill and Marr, each a former salesperson of facsimile devices distributed by OPD. These plaintiffs were subsequently joined by nine other named plaintiffs, none of whom were facsimile salespeople for OPD.

**3.** Class actions under the ADEA are governed by section 16(b) of the Fair Labor Standards Act, which provides "[n]o employee shall be a party plaintiff ... unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b) (Supp.1987).

**4.** Previously, on October 6, 1983, plaintiffs filed a Second Amended Complaint which added nine named plaintiffs. The additional plaintiffs

were all former Xerox employees who claimed they were terminated as a direct result of "age based corporate policies and practices that had been fully designed and implemented to terminate or force into retirement a high percentage of persons forty or over ... during a reduction in salaried work force and thereby create available openings in order to retain younger employees with less length in service and/or to hire new employees under forty." (Plaintiffs' Brief in Support of Cross–Motion for Summary Judgment or a Presumption of Class–Wide Liability and in Opposition to Defendant's Motion to Decertify the Class ("PB") at 8.)

seventy or have been denied equal employment opportunities for promotion at any unit, division or American subsidiary of Xerox Corporation and who contend that such termination, retirement or denial of promotion was caused by age discrimination policies or practices of Xerox Corporation.

(Conditional Certification Order, ¶ 2.)

In conditionally certifying the class, the court provided that it was "without prejudice to the respective parties' rights to move for decertification of the action as a class action...." (Conditional Certification Order, ¶ 7.) At the hearing on class certification which lead to the Conditional Certification Order, Judge Stern stated:

And down the road there will come a time when they're going to have to show that for this case to go forward, that from all these notifications, and all this investigation, and all this discovery, they have got an honest to goodness case. But I have a pretty good idea where a cart is and where a horse is. I think the best way to find out if you have a cart from the horse is to let these people communicate in a meaningful way with that group of people that they say they can prove were wronged.[5]

(Transcript of Hearing, December 22, 1983, at 28:22–29:5.)

The parties entered into a discovery plan (the "discovery plan") which the court approved by Order, dated September 5, 1984. Pursuant to the discovery plan, the parties randomly selected a sample of fifty-one class members as a microcosm of the entire conditional class. During a twenty month period beginning in November, 1984, extensive discovery which focused on the thirteen named plaintiffs and fifty-one sample members (the "sample group") has been conducted and completed. During this time,

Xerox produced and counsel for the plaintiffs examined approximately 100,-000 pages of documents; 29 days of depositions were taken of nine Xerox executives and key members of its personnel departments; 25 days of depositions were taken of 10 of the 13 named plaintiffs; and a total of nearly 100 interrogatories were answered.

(PB at 10.) Some of the data which were obtained through this discovery are summarized in Appendix A to this Opinion.[6]

Although 1,312 additional plaintiffs have "opted-in" as members of the conditional class, plaintiffs have moved to file a Third Amended Complaint to add a fourteenth named plaintiff, and thereby expand the class period to include April 1, 1983 through May 1, 1984. The proposed Third Amended Complaint also includes class-wide allegations of state contract claims and state age discrimination claims. On June 2, 1986, Magistrate Ronald Hedges denied leave to file the Third Amended Complaint without prejudice to renew after disposition of the instant motions.

### III. FACTS

#### A. Xerox Business History and Reductions in the Workforce

In the early 1970's Xerox introduced the first practical dry copier causing its business to grow rapidly. Over the years the business of Xerox expanded into different

---

**5.** A Xerox appeal of the conditional class certification was dismissed by the Third Circuit for want of jurisdiction. *See Lusardi v. Xerox,* 747 F.2d 174, 178 (3d Cir.1984). The court however anticipated that should Xerox prevail on a subsequent motion to decertify the conditional class, "the likely result ... would be a revocation of the consents, a tolling of the statute of limitations, and a notice to the parties that they may proceed individually." *Id.* at 178. At oral argument on the instant motion, counsel for Xerox indicated the statute of limitations would be tolled from the time the individual plaintiff opted in until receipt of the decertification notice. (See Transcript of Hearing, January 9,

1987, at 5:22–25.) Accordingly, the instant decision is one concerning procedure, not a decision on the merits of plaintiffs' individual claims.

**6.** Appendix A contains information concerning the named plaintiffs and sample group including the date of hire, age at hire, title, last grade and salary, organization, location, last supervisor, employment status at time of opt-in, corrective action (performance improvement plan), separation date, age at separation and nature of the claim. This information was compiled and submitted by Xerox; it does not appear the accuracy of this information is in issue.

fields such as book publishing, computers, computer related equipment, military equipment and financial services. (See Xerox Memorandum in Support of Motion to "Decertify" the Conditional Class ("XM") at 4.)

By the early 1980's, however, Xerox was faced with a very tough set of problems. (Kearns[7] Deposition Transcript at 11:25; 12:1–17.)[8] The copier market became saturated with low-cost, high quality products produced by Japanese and other competitors. In 1981, the state of affairs at Xerox was described as "unsatisfactory" due to declining profits and profit margins. Xerox was rapidly losing market shares. (Glavin[9] at 20:12–16.) Through a process called "competitive benchmarking" Xerox examined its competition and found its competitors were able to manufacture a quality product at a cost of approximately thirty to forty percent less than Xerox. (Glavin at 21:18–21.)

Xerox attempted to turn itself around by decreasing costs across the board. Various non-worker related cost-cutting measures were implemented. However, because payroll costs accounted for more than fifty percent of the total expenses of Xerox, the work force became a target for reduction. (Reid Affidavit,[10] ¶ 3.) Xerox therefore reactivated and implemented a number of programs which would eventually lead to the reduction in size of the work force or "downsizing."

The policies governing separations and work force reductions had been adopted and were in effect in various Xerox units prior to the implementation of the cost cutting efforts which are the subject of this Opinion. Specifically, "[t]he reduction in force ["RIF"] programs utilized to meet the business crisis beginning in 1980 were not newly written. They had been on the books for some years and had been utilized occasionally in the 1970's when specific surplus populations had developed which could not be absorbed within the Company." (Kearns Affidavit, ¶ 10.)

Certain Xerox subsidiaries such as Crum & Forster,[11] Shugart Data Systems and Versatec maintained autonomous personnel policies. (Reid Affidavit, ¶ 6.) However, where Xerox personnel policies did apply, the policies were established by the Xerox corporate management committee, implemented by local management on a decentralized level and in place to insure equal treatment of employees in accomplishing work force reductions. (*Id.,* ¶¶ 2, 4–5.)

The Xerox corporate personnel department never set work force targets for RIFs. In those organizations or departments where Xerox personnel policies did apply,[12] individual units, when the need for reductions became apparent and as part of their regular operating plan, submitted targets for RIFs to corporate headquarters. (Reid Affidavit, ¶ 7.) The actual plans to reduce the work force were developed and implemented locally by the individual operating units. Reductions could be achieved through various methods which included attrition, redeployment, hiring freezes or, if approved by corporate headquarters in advance, by a voluntary reduction in force ("VRIF") or an involuntary reduction in force ("IRIF"), depending upon the individual needs of the operating units. (*Id.,* ¶ 8.)

---

7. David T. Kearns, the President and Chief Operating Officer of Xerox from August, 1977 to May, 1982, became Chief Executive Officer in May, 1982 and Chairman of the Board in May, 1985.

8. Deposition testimony will hereinafter be referred to as "[Name of Deponent] at ——."

9. William F. Glavin, Executive Vice–President of Xerox.

10. Douglas M. Reid, Senior Vice President, Personnel and Senior Staff Officer.

11. Crum & Forster, a Xerox insurance subsidiary, was not acquired by Xerox until January, 1983. After the acquisition, Crum & Forster continued to operate under its own personnel policies, without reporting to Xerox. (Reid Affidavit, ¶ 6.)

12. For example, Crum & Forster was acquired by Xerox less than three months before the end of the class time period. RIFs or other job reductions which occurred at Crum & Forster were planned and undertaken without oversight by Xerox. (Reid Affidavit, ¶ 6.)

During a RIF, efforts were made to transfer surplus employees into available openings in their unit or other units. Layoff was deemed to be a last resort. (Reid Affidavit, ¶ 9.) Programs such as VRIF and retirement bridging were offered for persons desiring to leave their employment or to retire early. (Kearns Affidavit, ¶ 14.)

In certain units it was necessary to effect an IRIF. If an IRIF became necessary, the method of selecting employees was left to the discretion of the local operating units. In all cases, employee service, performance and skill requirements were considered. (Reid Affidavit, ¶ 20.) "Although every organization took these criteria into consideration, the actual methods used to identify employees could differ." (PB at 27; see also id. at 35.) For example, some units employed different variations on a stack ranking system, while others devised service/performance matrices. Nevertheless, the actual recommendations concerning who would be included in an IRIF were made by thousands of individual managers and supervisors, many of whom were over the age of forty.[13] (Id.) These recommendations were based upon the employee's past performance appraisals. "These appraisals were prepared pursuant to a long-standing procedure that had been tried and tested by the [Xerox] Corporate personnel department and were used primarily for assessing the annual merit increase that the employee should receive." (XM at 8 n. 12.)

Before an IRIF action was implemented, the unit was analyzed in order to make sure the representation of females, minorities and persons age forty and over would be maintained. (Kearns Affidavit, ¶ 12.) The results were reviewed by the Xerox personnel and legal departments for the purpose of correcting any significant reduction in the relative numbers of those groups. (Id.)

Xerox also maintained policies to protect certain other categories of workers. For example, a policy known as the "over eight" policy, was designed by Xerox to protect its employees with eight or more years experience. It required the personal review by and approval of the President of Xerox of an involuntary termination of any such employee. (Reid Affidavit, ¶ 22.) In addition, a category was developed wherein special consideration was given to those employees whose age plus years of service was greater than sixty-five ("combination sixty-five"). (Kearns Affidavit, ¶ 12; Reid Affidavit, ¶ 22.)

The described downsizing of the Xerox work force was implemented and managed at the local level. The local management assessed its particular work force needs, consistent with corporate policy. Accordingly, a reduction differed not only from organization to organization but also from manager to manager, as well as from RIF to RIF. It appears there was never a corporate-wide VRIF or IRIF. However, "there were at least 40 separate IRIF's and more than 25 separate VRIF's during the class period conducted at various times by particular Xerox organizations." (XM at 9.)

### B. The Downsizing Process

The downsizing process is best understood by examining the structure of a specific Xerox organization during the relevant period. In this regard, the Xerox Reprographic Business Group ("RBG") is not atypical of the Xerox organizations.

During the years 1980 through 1983, Stephen J. McGrath was Vice President, Personnel for the RBG headquartered in Web-

---

13. Plaintiffs argue "that Xerox's RIF policies had a disparate impact on its older, protected employees[,]" and "that the RIFs were part of a pattern or practice of age discrimination." (PB at 3.) However, Xerox notes that:

> If there had been such a far-flung conspiracy, the claimants were miraculously shielded from it. Each sample member who had been a manager was asked by way of interrogatory to identify whether he ever used age as a

factor in making personnel decisions. Each answered no. Sheldon, Salvatore, and Miller were the only named plaintiffs who were managers or supervisors during some portion of the class period, and they admitted during their depositions that they had not used age as a factor. (Sheldon Tr. 49; Salvatore Tr. 15; Miller Tr. 28, 30).

(XM at 20, n. 17.)

ster, New York. (McGrath Affidavit, ¶ 1.) The RBG is a large, geographically dispersed organization consisting of major sub-organizations. (*Id.*, ¶ 10.)[14] Each of the major sub-organizations within the RBG has its own decentralized personnel office. Although RIF practices were established and monitored at the RBG group level and approved as required at the corporate level, each individual personnel office was responsible for implementing a RIF within its particular organizational unit. (*Id.*)

When downsizing began, each operating sub-organization and sub-unit within the RBG determined the minimum number of people and necessary skills required to maintain operations. An attempt was made to place the "surplus" employees within other sub-organizations or sub-units of the RBG in a phase called "manpower balancing." When surplus employees could not be absorbed elsewhere in the RBG, or in other Xerox organizations, the next phase was generally a VRIF. VRIFs resulted only in the elimination of a surplus position. Throughout a VRIF, the work force balancing program was operational.

If a surplus existed after a VRIF, the RBG used a matrix to determine which employees would be included in an IRIF. A matrix was devised for the various skill categories and took performance and service into account.[15] Surplus employees were assigned a priority category or "cell" based upon the matrix. Cell 1 reflected consistent substandard performance; Cell 2 average performance with less than 15 years of service; Cell 3 or higher for longer tenured employees or those with above average performance ratings. Employees placed in Cell 3 or above were able to replace employees in a lower cell with the same skill classification within RBG.

A list of employees for inclusion in an IRIF at an RBG sub-organization was drawn from the matrices. The final selection and approval process was performed at the RBG group level. Corporate headquarters followed the IRIF process through verification of compliance with the "over eight" and "combination sixty-five" programs. Corporate personnel also monitored the statistics to ensure proper representation of women, minorities and employees over the age of forty was maintained.

### C. Facts Concerning The Sample Group from the Conditional Class

Individual employments with Xerox could cease for any number of reasons and at any time during a RIF. As indicated by the description of the RBG downsizing process, numerous options were available to employees and a variety of factors could account for each termination. The disparity and variety of individual situations is best illustrated by the information obtained on the members of the sample group. (See generally Appendix A.)

The members of the sample group were employed by various Xerox organizations at numerous geographic locations. For example, without regard to departmental differences, members of the sample group were employed by seventeen different Xerox groups or organizations in thirty-four cities or towns in sixteen different states.[16] The claims of the sample group also arise from a variety of employment actions. In this regard, of the sixty-four people in the sample group, twenty-six were terminated as the result of an IRIF, ten allege the VRIFs they accepted were not voluntary, eight employees who were active during the class period allege denial of promotion, five employees who were terminated for unsatisfactory performance allege they were terminated as a result of their age, six employees who left Xerox to accept or

---

**14.** The RBG major sub-organizations are further divided into various sub-divisions. (See generally Reid Affidavit, Exhs. 5–8.)

**15.** The use of criteria involving skill and performance are to a large extent subjective and involve facts and data unique to the IRIFed (or VRIFed) employee.

**16.** These figures may be broken down even further. For example, of the sixty-four employees described in Appendix A, seven were employed by OPD. These seven were scattered across six different geographic locations and had five different supervisors.

seek other employment now allege they were denied promotions or forced to resign, four employees who were permitted resignation now allege their resignations were not voluntary, two employees who accepted normal retirement allege they were forced to do so, two employees who voluntarily separated from Xerox due to job dissatisfaction now allege they were forced to retire; and one employee who resigned before probable discharge alleges the resignation was forced.

The discovery also reveals a dramatic lack of similarity in age, salary, organization employment, and geographic location by state and city. With regard to age, twenty-four of the sample group are in the range of forty to forty-five years, seventeen are in the range of forty-six to fifty years, fifteen are in the range of fifty-one to fifty-five years, six are in the range of fifty-six to sixty years, and two are in the range of sixty-one to sixty-five years. With regard to the total compensation received by each of the individuals in the sample group, six received between $10,000 and $20,000 per annum, twenty-six received between $20,000 and $30,000 per annum, fourteen received between $30,000 and $40,000 per annum, seven received between $40,000 and $50,000, eight received between $50,000 and $60,000, two received between $60,000 and $70,000, and one received between $70,000 and $80,000. The sample group represents employment with seventeen Xerox organizations at offices located in thirty-four cities in sixteen states.[17]

## IV. DISCUSSION

### A. The ADEA Similarly Situated Requirement

The goal of the ADEA is the "elimination of discrimination from the workplace," *Lorillard v. Pons,* 434 U.S. 575, 584, 98

S.Ct. 866, 872, 55 L.Ed.2d 40 (1978), by "promot[ing] employment of older persons based on their ability rather than age ... [and] prohibit[ing] arbitrary age discrimination in employment...." 29 U.S.C. § 621(b) (1985). Discrimination because of age is the only conduct proscribed by the ADEA. *See Elliott v. Group Medical & Surgical Service,* 714 F.2d 556, 567 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984).

The relief provisions of the ADEA are found in section 7(b) which states that the ADEA shall be enforced by the "powers, remedies and procedures" of the FLSA. 29 U.S.C. § 626(b). Specifically, the ADEA incorporates section 16 of the FLSA, 29 U.S.C. § 216(b) (West Supp.1987) (as amended by the Portal to Portal Act of 1947, 29 U.S.C. § 251, *et seq.*) which states in pertinent part:

> An action to recover the liability prescribed in [this Title] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

The requirements for pursuing a section 216(b) class action are independent of and unrelated to the requirements of a class action filed pursuant to Rule 23, Fed.R.Civ. P.[18] *See, e.g., LaChapelle v. Owens–Illinios, Inc.,* 513 F.2d 286, 289 (5th Cir.1975) ("opt-out" and "opt-in" class actions are "mutually exclusive and irreconcilable"). As is clear from the language of section 216(b), an employee may bring an action against his employer for himself and those

---

**17.** Appendix B to this Opinion summarizes the above-described data.

**18.** An ADEA class action differs from the more common Rule 23, Fed.R.Civ.P., class action in that Rule 23 requires class members who do not wish to be bound by the action to "opt-out" and a section 216(b) class action requires the poten-

tial members of the putative class to "opt-in" in order to participate in the action. The various inquiries concerning a Rule 23 class, however, while not controlling or even required to be considered, are instructive and lend useful guidance in considering the similarly situated requirement of a section 216(b) class.

of his fellow employees who are similarly situated, provided the necessary filings are effected.

Neither the FLSA nor the ADEA provides a definition of or guidance for application of the similarly situated standard. Plaintiffs suggest the requirement should be defined as "a concept that signifies a relationship between an unlawful policy or practice and classwide injury stemming from that unlawful policy or practice." (PB at 4.) Based on this definition, the thirteen named plaintiffs seek to represent the 1,312 "opt-ins" and to proceed against Xerox as a class. The inquiry, therefore, is whether resolution of the present claims in a class configuration is consistent with the general purposes and objectives of the class action procedure and the ADEA. Stated another way, is the extent to which the named plaintiffs and the "opt-ins" are similarly situated sufficient to allow continued certification of the class.

A review of the facts and applicable law demonstrates plaintiffs' position on the issue of certification is both unfounded and contrary to settled legal principles. Other than the allegations of plaintiffs concerning violations of the ADEA, their former or present status as Xerox employees and their age group, there is no commonality among the plaintiffs and the sample group. In addition, plaintiffs, after extensive discovery,[19] have not uncovered any policy or practice of age discrimination at Xerox. For several reasons, including (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to Xerox which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) the apparent absence of filings required by the ADEA prior to instituting suit, the class will be decertified.

**B. *Other Decisions Concerning The Similarly Situated Standard***

Reported decisions considering whether a proposed class meets the similarly situated requirement are few in number. These decisions offer little substantive guidance for the issues presented in this case.[20] For example, *Plummer v. General Electric Co.,* 93 F.R.D. 311 (E.D.Pa.1981), involved an age discrimination claim wherein plaintiff sought leave to amend his complaint in order to represent eight persons against whom the defendant had allegedly discriminated in ways similar to those alleged by plaintiff. The court examined the claims of each of the eight additional plaintiffs and determined they were not sufficiently similar to be maintained as a single class. Instead, the court divided the plaintiffs into two separate groups. The claims of the first group were found to be similar to plaintiffs and, therefore, their action went forward as a class. The allegations made by the second group, however, were found to be "significantly distinct" from those of the plaintiff and were not included. *Id.* at 312.

In allowing the first group to proceed under section 216(b) the *Plummer* court found that because the members of the first group had worked in or applied to the same General Electric department, alleged similar claims of age-based discrimination relating to the promotion policy, job assignment and salary determination, and sought similar damages and equitable relief, "consolidation of their claims into a single representative action would ... provide an efficient procedure for litigating these related claims." *Id.*

When examining the claims of the workers in the second group, the court found they were employed in departments other than those of named plaintiffs. The Court

---

**19.** As noted by plaintiffs: "In [their] view, a hearing is unnecessary. The evidence now before the Court is sufficient to adjudicate *all* issues." (PB at 11) (emphasis added).

**20.** In this regard, one commentator has noted: "[t]he case law to date provides little guidance on the factors a court should consider in deciding whether a given case is appropriate for

opt-in class treatment. Section 216(b) [of the FLSA] itself provides no guidance beyond the requirement that plaintiffs be 'similarly situated.'" Spahn, *Resurrecting the Spurious Class: Opting–In to the Age Discrimination in Employment Act and the Equal Pay Act Through the Fair Labor Standards Act,* 71 Geo.L.J. 119, 144–45 (1982).

also noted the defenses raised by General Electric would require inquiry into the employment situation of each plaintiff rather than on a broad scale approach to the employment situation of the group. *Id.* As a result of these differences, the court ruled that "the propriety and usefulness of the section 216(b) procedure" would be diminished if all the plaintiffs were included. *Id.*

A similar question was presented in *Owens v. Bethlehem Mines Corp.*, 108 F.R.D. 207 (S.D.W.Va.1985). The complaint in *Owens* arose out of a reduction in force conducted by Bethlehem Mines after consolidating two of its divisions. Owens, an employee at one of the divisions, filed an action under the ADEA claiming the reduction in force was applied in a discriminatory fashion. A separate but similar complaint was filed by plaintiff Carrico, also a former employee of one of the consolidated divisions. Carrico brought the action "on behalf of himself and all other employees similarly situated who wish to join this action." *Id.* at 209. Motions to consolidate the two actions and to certify a class were filed.

The court rejected the argument of Bethlehem Mines that the different departments in which Owens and Carrico were employed were autonomous and instead focused on the nature of a reduction in force. Finding that "[s]uch a decision obviously is made at a high level in the organization[,]" (*id.* at 212) the court certified a class consisting of those employees in the protected age group who were terminated during the three-month company-wide reduction in force.

In *Burgett v. Cudahy Co.*, 361 F.Supp. 617 (D.Kan.1973), the court applied the "similarly situated" requirement, and considered five factors relevant to its analysis of the named plaintiff and three other potential class members: (1) the plaintiffs were all between the ages of sixty and sixty-five, (2) plaintiffs were long-time supervisory personnel at the same plant, (3) they were terminated and rehired by the defendant company at approximately the same time and apparently for the same reasons, (4) they alleged the same discriminatory treatment and resulting injury; and (5) they sought the same affirmative relief. *Id.* 361 F.Supp. at 622. In light of these similarities and because the plaintiffs had filed written consents, the court allowed the action to proceed under section 216(b). *Id.* at 622.

In *Allen v. Marshall Field & Co.*, 93 F.R.D. 438 (N.D.Ill.1982) plaintiffs brought a class action under the ADEA and moved for the court's permission to send notice of the action to potential class members. The company argued notice was inappropriate "because the current plaintiffs occupied varying positions in its corporate hierarchy, worked in different locations, and allege discriminatory actions occurring on 'vastly varying dates[,]'" and therefore did not meet the "similarly situated" requirement of section 216(b). *Id.* at 442. The court found notification to be appropriate, reasoning:

> [t]he named plaintiffs in this case have alleged a campaign of discrimination by Marshall Field, which transcends minor differences in their levels of management responsibility geographic location, and dates of alleged discriminatory actions.

*Id.* at 443. Notice to all potential claimants was authorized "regardless of whether [the court] may later find it necessary to bar some of them from joining in [the] action."[21] *Id.* 93 F.R.D. at 445. *See also Behr v. Drake Hotel*, 586 F.Supp. 427 (N.D.Ill.1984) (class certification based on *Allen, supra*); *Sussman v. Vornado, Inc.*, 90 F.R.D. 680 (D.N.J.1981) (class certification with minimal discussion of the "similarly situated" requirement).

Plaintiffs argue they "are required to show only that their positions are similar, not identical, to other class members." (PB at 53.) They also contend: " 'Similarly situated' appears intuitively to require that all members of the class claim injury from

---

21. The notice which was ultimately authorized and sent was limited by geographic location and employment position to "all former and current management-level employees of Marshall Field's Chicago Division who have been adversely affected by discharge, early retirement, demotion, or transfer since January 1, 1977." *Allen*, 93 F.R.D. at 446.

the same policies or practices of the defendant." (*Id.*) For this position, they rely upon *Bethlehem Mines* and several other cases discussed in this section. All of these cases are distinguishable, however.

To make their point, plaintiffs seek to explain the holding in *Owens v. Bethlehem Mines.* There the court found plaintiffs were similarly situated despite differences in departments, management structure and geographic location. However, the common thread unifying plaintiffs' claims in *Owens* (as in the other cases cited by plaintiffs) was the company wide action which apparently occurred at Bethlehem Mines during a short period of time.

This matter presents a scenario of not a single company wide RIF but of twenty-eight VRIFs affecting fourteen Xerox organizations and forty-seven IRIFs affecting seventeen Xerox organizations. These RIFs occurred during a four year period, largely at different times. There is no single, company wide action in this matter, as presented to the court in the cases cited by plaintiffs.

These decisions, however, represent merely a starting point for an examination of the "similarly situated" requirement in the context of the ADEA, and are not persuasive, as applied to the instant facts. For two additional, critical reasons, these opinions are virtually inapposite to this case. First, previous decisions did not consider a class as far-reaching and disparate as the class plaintiffs presently suggest. In cases such as *Owens* and *Behr*, the class or notice to the potential class members was somehow limited by geographic location, employment position or approximate date of the employee's termination. For all practical purposes, no such restriction has been imposed or suggested here.[22]

Second, in other cases the similarly situated inquiry is posed prior to class certification, and based upon the court's determination, the class or notice of the class action is tailored accordingly. This case presents

a situation of a class which was conditionally certified without a determination of whether its members are similarly situated. As noted earlier, when the conditional certification was granted, Judge Stern anticipated a final decision on class certification after discovery focused on the named plaintiffs and the members of the sample group. This procedure was implemented specifically to allow discovery on the circumstances of and facts surrounding the class members and named plaintiffs and to avoid creation of what Judge Stern called "a monster that no one can deal with, made up with a lot of individual people with specific grievances." (Transcript of Hearing, December 22, 1983, at 22:21–23.) Accordingly, my focus for purposes of determining the appropriateness of the class must be on the facts and circumstances surrounding the sample fifty-one opt-ins and thirteen named plaintiffs.

## C. *The Instant Action*

As is evident from the discussion of the facts, and as summarized in Appendices A and B, the members of the sample group represent disparate employment situations. The differences among the individual plaintiffs are significant not only to plaintiffs' claims but as well to the ability of Xerox to defend against the claims. In this regard there are several ways for Xerox to respond after a *prima facie* case of age discrimination has been established. In short, the defenses available to Xerox are as disparate as the plaintiffs themselves.

An individual *prima facie* case of discrimination may be established under two theories: disparate treatment and disparate impact. *See, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–39, 97 S.Ct. 1843, 1854–56, 52 L.Ed.2d 396 (1977) ("Teamsters"); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). Disparate treatment involves the intentional discrimination against a protected class;

---

**22.** The Conditional Certification Order allows for the inclusion of all salaried employees in the requisite age group who allege they were denied equal employment opportunities at any unit, division or American subsidiary of Xerox because of age discrimination during the defined period.

disparate impact concerns facially neutral policies which disproportionately burden those protected. These theories of discrimination, while traditionally applied in the Title VII context, are also available to ADEA plaintiffs. *See, e.g., Massarsky v. General Motors Corp.*, 706 F.2d 111, 117 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).[23]

The instant action presents a disparate treatment claim in which plaintiffs allege they were adversely affected by a pattern or practice of discriminatory treatment.[24] In a disparate treatment Title VII class action such as *Teamsters*, plaintiffs have the initial burden to "establish by a preponderance of the evidence that [the prohibited] discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855 (footnote omitted). Plaintiffs may satisfy this burden through use of direct evidence or circumstantial evidence, including statistical evidence.

Once the burden has been met by plaintiffs establishing a *prima facie* case, the burden of production shifts to the defendant to rebut the inference of discrimination created by plaintiff's *prima facie* case. *See id.* at 360, 97 S.Ct. at 1867. Defendant may challenge plaintiffs' statistical evidence with conflicting data or by providing a legitimate, non-discriminatory explana-

tion for the discriminatory result of its actions. *See id.* at 361 and n. 46, 97 S.Ct. at 1867 and n. 46. Plaintiffs may then refute this explanation as a pretext for discrimination.

In the ADEA context, an employer may defend an age discrimination claim on the ground that the differentiation was based on "reasonable factors other than age." 29 U.S.C. § 623(f)(1).[25] The ADEA cannot be violated so long as the challenged action was not motivated by age bias. *See generally* Note, *Age Discrimination and the Disparate Impact Doctrine*, 34 Stan.L. Rev. 837, 843–847 (1982). Therefore, the ultimate issue for determination is whether the defendant discriminated against each of the plaintiffs based upon age. In this regard, "[s]elf-serving and speculative testimony [offered by a plaintiff] is subject to especially searching scrutiny." *Elliott v. Group Medical & Surgical Service, supra*, 714 F.2d at 564. Moreover, a plaintiff's generalized testimony asserting a subjective belief of an age based discharge is "insufficient to make an issue for the jury in the face of proof showing an adequate, nondiscriminatory reason for [the] discharge." *Id.* Clearly, if such considerations are available to an employer defending a claim made by an individual or series of individuals in a setting other than a class

---

**23.** Although the Third Circuit has not expressly stated whether the disparate impact test applies to the ADEA, *see Massarsky*, 706 F.2d at 120, other circuit courts have applied the disparate impact test in the ADEA context. *See, e.g., Sakellar v. Lockheed Missiles and Space Co.*, 765 F.2d 1453 (9th Cir.1985), *cert. denied*, 474 U.S. 1084, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986); *Leftwich v. Harris–Stowe State College*, 702 F.2d 686 (8th Cir.1983); *Allison v. Western Union Telegraph Co.*, 680 F.2d 1318 (11th Cir.1982); *Geller v. Markham*, 635 F.2d 1027 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). Furthermore, several district courts in the Third Circuit have concluded similarly. *See Reilly v. Prudential Property and Cas. Ins. Co.*, 653 F.Supp. 725, 729 (D.N.J.1987); *Woodfield v. Heckler*, 591 F.Supp. 1390, 1397 (E.D.Pa.1984); *Popko v. Clairton*, 570 F.Supp. 446, 451 (W.D.Pa.1983); *Grecco v. Spang & Co.*, 527 F.Supp. 978 (W.D.Pa.1981), *aff'd*, 779 F.2d 44 (3d Cir.1985), *cert. denied*, 475 U.S. 1036, 106 S.Ct. 1246, 89 L.Ed.2d 354 (1986).

**24.** While unclear from the various submissions, at oral argument, plaintiffs' counsel stated the action was one for disparate treatment. (See Transcript of Hearing, February 20, 1987, at 25:2–23.)

**25.** 29 U.S.C. § 623 provides:

It shall not be unlawful for an employer, employment agency, or labor organization—
(1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age, or where such practices involve an employee in a workplace in a foreign country, and compliance with such subsections would cause such employer, or a corporation controlled by such employer, to violate the laws of the country in which such workplace is located[.]

action, such are available in defense of a class action.

For example, in *Houser v. Sears, Roebuck & Co.*, 627 F.2d 756 (5th Cir.1980), the Fifth Circuit affirmed a directed verdict for Sears in what plaintiff asserted to be a clear cut case of age discrimination. Mr. Houser, who was fifty-four at the time of his termination and had almost twenty years service with Sears, was replaced by a twenty-nine year old worker. The evidence showed Houser was "an exceptionally able, diligent, and hard-working [credit] manager." *Id.* at 758. Sears explained the reason for the discharge was a single incident of a deliberately misapplied credit which Houser believed was in Sears' best interest. Houser contended the firing was pretextual and testified the actual reason for his discharge was to permit Sears to replace him with a less-senior worker not entitled, as Houser was, to participate in Sears' most desirable profit sharing plan. Despite plaintiffs' arguments, the court found there was no substantial evidence presented from which a jury could infer that Houser had been discharged for reasons relating to age. *Id.* at 759.

### D. *Defenses To ADEA Claims*

The cases interpreting the defenses and the applicability of the defenses to the instant facts illustrate the proposed class plaintiffs are not similarly situated and that considerations of fairness, as well as, efficiency are defeated by maintenance of a class action in this case.

In response to a *prima facie* case based upon circumstantial evidence, an employer may contend there has been no discrimination by simply "explain[ing] what he has done" or "produc[ing] evidence of legitimate nondiscriminatory reasons." *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, n. 2, 99 S.Ct. 295, 296, n. 2, 58 L.Ed.2d 216 (1978). The burden of rebutting such a *prima facie* case may be satisfied if the employer "pro-

duce[s] admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). Although *Sweeney* and *Burdine* were actions brought under Title VII, the courts have construed Title VII and ADEA consistently; cases arising under each are frequently applied to similar cases under the other. *See generally, Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (where source of section in ADEA parallels Title VII, the two statutes are to be construed consistently); Note, *The Age Discrimination in Employment Act of 1967*, 90 Harv.L.Rev. 380 (1976).

Under the ADEA, the ultimate burden of proof resides with the plaintiff to prove age was a determinative factor in the defendant employer's decision. *See Gavalik v. Continental Can Co.*, 812 F.2d 834, 852, 858–60 (3d Cir.1987), *petition for cert. filed* (April 16, 1987); *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1395 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984). However, under the three tier analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and later clarified in *Burdine, supra*, the burden shifts to the defendant following a plaintiff's establishment, by a preponderance of the evidence, of a *prima facie* case of discrimination.[26] *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. By establishing a *prima facie* case the plaintiff creates a rebuttable presumption of unlawful discrimination which the defendant may overcome by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93

---

**26.** In order to establish a prima facie case of age discrimination, a plaintiff must prove that he (1) was discharged; (2) was qualified for the position; (3) was within the protected class at the time of discharge; (4) was replaced by someone outside the protected class; or (5) by someone younger, or (6) show otherwise that his discharge was because of his age. *See Elliott v. Group Medical & Surgical Service, supra*, 714 F.2d at 565.

S.Ct. at 1824.[27]

In this case, for example, at the time of his resignation, Daniel Mongiovi, a member of the sample group, was fifty-one and a senior national account manager in the Business Systems Group ("BSG") major accounts-sales located in New York. Mongiovi had a salary of $49,965 per year. He alleges a forced resignation and denial of promotion in violation of the ADEA. Xerox, however, contends that Mongiovi voluntarily left its employ, resigning to take another job. Indeed Xerox has asserted lack of discrimination in part based on statements contained in Mongiovi's letter of resignation. (*See* Compendia at 40 in Appendix to XM) ("Compendia").

### 1. *For Good Cause*

An employer may demonstrate the absence of discrimination by showing that the action in question was taken "for good cause." 29 U.S.C. § 623(f)(3).[28] In this regard an employer need only come forward with evidence that the discharge was for good cause and, in some instances, a mere assertion may suffice. *See Harpring v. Continental Oil Co.*, 628 F.2d 406, 408–09 (5th Cir.1980), *cert. denied*, 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981).

The good cause defense does not shift the burden of proof to the employer, rather it merely requires that the defendant muster a rebuttal as to the inference created by a plaintiff's *prima facie* case. *See Marshall v. Westinghouse Electric Corp.*, 576 F.2d 588 (5th Cir.1978). Therefore where the employer articulates a particular legitimate non-discriminatory reason for its action, here good cause, it has fulfilled its burden of production; the plaintiff still bears the ultimate burden of proving age was a determinative factor in the decision. *See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897–98 (3d Cir.1987) (ultimate burden of proof of unlawful discrimination is borne by a plaintiff throughout the pro-

ceeding and defendant's burden consists of producing a rebuttal to inference created by a plaintiff's prima facie case), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

Factors constituting good cause are numerous. In *Harpring, supra,* the employer met its burden of rebutting the former employee's *prima facie* case of age discrimination by proferring testimony of other employees that Harpring's work was "incomplete, incomprehensible, and generally of poor quality...." *Harpring*, 628 F.2d at 407. Witnesses also testified Harpring failed to demonstrate the requisite supervisory and organizational skills and that age was not a factor in Harpring's discharge. *Id.*

Employers in proving good cause have also successfully relied on instances of falsifying work records, *Anderson v. Savage Laboratories, Inc.*, 675 F.2d 1221, 1223 (11th Cir.1982), quantity or quality of production requirements, *Surrisi v. Conwed Corp.*, 510 F.2d 1088, 1089 (8th Cir.1975), personality conflicts due to insubordination, uncooperativeness, and failure to keep superiors informed, *Keller v. Bluemle*, 571 F.Supp. 364, 368 (E.D.Pa.), *aff'd*, 735 F.2d 1349 (3rd Cir.1984); *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1414 (7th Cir.1984), strike threats and labor organization demands, *Sherman v. St. Barnabas Hospital*, 535 F.Supp. 564, 575 (S.D.N.Y.1982), and "burn out", loss of creativity and initiative, *Chamberlain v. Bissell Inc.*, 547 F.Supp. 1067, 1077 (W.D.Mich.1982).

The good cause defense appears to be applicable to at least one member of the sample group. Diane Murray, an information systems marketing representative at BSG, Dallas, Texas, was forty-four at the time of her discharge. She had an annual salary of $20,280 plus commissions. Murray contends she was denied territorial assignments and that her dismissal was

---

**27.** See *Fairness and Procedural Considerations, supra,* for additional discussion of the *McDonnell Douglas/Burdine* burden shifting between plaintiff and defendant.

**28.** 29 U.S.C. § 623(f) provides:

It shall not be unlawful for an employer, employment agency, or labor organization—
(3) to discharge or otherwise discipline an individual for good cause.

based upon her age. Xerox, however, contests any such claim, asserting Murray was terminated with good cause for flagrant disregard of company interests where she allegedly submitted false disability claims. Xerox further contends Murray chose her sales territory and that her replacement had the highest sales performance in the district. (Compendia at 41.) Xerox also asserts the claims of Mongiovi and Murray are outside the class time period since separation occurred on July 15, 1983 and April 30, 1984 respectively.[29] (Compendia at 40, 41.)

### 2. *Bona Fide Occupational Qualification*

The defense of a bona fide occupational qualification ("BFOQ") is applicable where age is made an express employment criterion, *e.g.*, where a job announcement specifies a position is only open to persons of a certain age. The ADEA provides age may, in an appropriate case, be a BFOQ if the age criterion is "reasonably necessary to the normal operation of the particular business," and in such a case, the age criterion is not violative of the Act. 29 U.S.C. § 623(f)(1). A BFOQ must be reasonably necessary to the essence of the business and the employer must have a factual basis for believing all or substantially all persons within the excluded class would be unable to perform the job's duties safely and efficiently or that it would be impossible or impracticable to deal with persons over the age limit on an individualized basis. *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 416–17, 105 S.Ct. 2743, 2752–53, 86 L.Ed.2d 321 (1985) (adopting test set forth

in *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 227 (5th Cir.1976)); *Arritt v. Grisell*, 567 F.2d 1267, 1271 (4th Cir.1977). However, "[b]efore a characteristic can be a reasonably necessary BFOQ, it must be a trait that the employer at least attempts to require of employees of all ages." *EEOC v. Pennsylvania*, 829 F.2d 392, 396 (3d Cir.1987).

The BFOQ defense admits of the discriminatory nature of the qualification and proceeds to justify the *prima facie* violation by its application to certain exigent occupational circumstances. The Third Circuit, as well as the Supreme Court, has recognized that a BFOQ is an affirmative defense, the assertion of which shifts the burden of proof to the defendant to justify its hiring policy. *See Criswell, supra,* 472 U.S. at 413–17, 105 S.Ct. at 2751–53 (citing with approval *Usery v. Tamiami Trail Tours,* 531 F.2d at 227; *EEOC v. Pennsylvania,* 768 F.2d 514, 518 (3d Cir.1985) (employer's burden of proof to make particularized factual showing with respect to all elements of BFOQ defense) (citing *Johnson v. Mayor of Baltimore,* 472 U.S. 353, 105 S.Ct. 2717, 86 L.Ed.2d 286 (1985)).[30]

### 3. *Business Necessity*

A defendant may also defend against ADEA claims by showing the challenged practice is justified on the basis of business necessity. "The defendants' burden of demonstrating business necessity is a heavy one. (citation omitted) They must show that [the challenged practice] has 'a manifest relationship to the employment in question,' ... [and] that there is a *compelling* need ... to maintain that practice.' "

---

**29.** As noted earlier, plaintiffs' motion to file a third amended complaint to expand the class period through May 1, 1984 was denied without prejudice.

**30.** Examples of special occupational circumstances in which a BFOQ may be appropriate are where actors of a certain age are required for either youthful or elderly roles or where persons of a certain age grouping are needed for advertising or promotions directed exclusively to either youthful or elderly consumers. *See* 29 C.F.R. § 860.102(e) (1986). A BFOQ defense has been recognized in the occupation of campus police officers, *EEOC v. University of Texas*

*Health Science Center,* 710 F.2d 1091 (5th Cir. 1983), and in certain public transportation industries where safety is of paramount concern and individual-by-individual determinations are impracticable. *See, e.g., Western Airlines, Inc. v. Criswell, supra,* 472 U.S. at 417, 105 S.Ct. at 2753; *Murnane v. American Airlines,* 667 F.2d 98, 101 (D.C.Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982); *Usery v. Tamiami Trail Tours, Inc., supra.* However, the employer must demonstrate a legitimate nexus between safety concerns and the challenged policy. It does not appear this is one of the defenses Xerox wishes to invoke in its defense.

*Leftwich v. Harris–Stowe State College,* 702 F.2d 686, 692 (8th Cir.1983) (quoting *Hawkins v. Anheuser–Busch, Inc.,* 697 F.2d 810, 815 (8th Cir.1983) (emphasis in original)). *But see Smith v. Farah Manufacturing Co.,* 650 F.2d 64, 67–68 (5th Cir. 1981) (employer need only offer proof sufficient to raise a genuine fact that discharge was for good cause or some reason other than age). While the other defenses available under the ADEA are affirmative defenses, the business necessity defense is more properly seen as a refutation of plaintiff's *prima facie* case. 3 A. Larson & L. Larson, *Employment Discrimination* § 100.20 (1981); B. Schlei & P. Grossman, *Employment Discrimination Law,* 505 (1983). That is, rather than attempting to justify disparate treatment as based on a BFOQ or the like, defendant claims it was not engaging in discriminatory conduct but was acting instead on the basis of some reasonable factor other than age, here a business necessity. *Elliott v. Group Medical & Surgical Service, supra,* 714 F.2d at 566–67; *EEOC v. Western Electric Co. Inc.,* 713 F.2d 1011, 1015 (4th Cir.1983).

In *EEOC v. Western Electric Co., Inc., supra,* the employer, experiencing a substantial downturn in its communications installation business, instituted a reduction in force among its installation supervisors. Area supervisors were directed to reduce the number of supervisors according to written policy guidelines through demotion and voluntary early retirement. Subsequent to the implemented reduction in force, an ADEA action was initiated by the Secretary of Labor who was later replaced as plaintiff by the EEOC. *Id.,* 713 F.2d at 1012–13.

Rebutting accusations of age discrimination in the selection of installment supervisors for demotion, Western proffered the testimony of each area supervisor responsible. In each individual case, the area supervisor responsible for the demotion testified concerning legitimate business decisions for each demotion. The district court found that Western's reduction in force discriminated individually and in its policy impacted against those in the protected class. An appeal was taken pending a stay of the proceedings. *Id.* On appeal Western argued that it had rebutted plaintiff's *prima facie* case and that the EEOC had failed to prove any *prima facie* case of pattern or practice discrimination. *Id.* at 1013–14.

In reversing the district court, the Fourth Circuit held Western had demoted all sixteen individuals for legitimate business reasons which were not pretextual. *Id.* at 1015. As to the claim of disparate treatment, the court held that because the EEOC was unable to bolster the marginal statistical evidence with individual cases of discrimination as to any of the sixteen testifying claimants, the statistical presentation was at most inconclusive circumstantial evidence. *Id.* at 1019. *Western Electric* is but one instance of a defendant employer presenting a business necessity defense to rebut with particularity both individual claims and classwide contentions.

In *Elliott v. Group Medical & Surgical Service, supra,* defendant employer, in an effort to increase efficiency in its sales operations and improve market penetration, implemented a reorganization, purging and replacing a number of top executives. Each of the executive plaintiffs was within the ADEA's protected class. *Id.* 714 F.2d at 559. Notwithstanding a motion to dismiss for failure to make a *prima facie* showing, the case was submitted to the jury. The jury found discrimination against each of the named plaintiffs, resulting in their willful termination due to age. *Id.* at 560.

On appeal the Fifth Circuit reversed the district court's decision to send plaintiff's case to the jury and held that once defendant had articulated a particular non-discriminatory business justification, here increased efficiency, by adequate evidence as to each plaintiff, "plaintiff's established *prima facie* case [was] not ... sufficient to take the case to the jury." *Id.* at 566. *McDonnell Douglas,* the court held, does not "permit[ ] the jury to examine an employer's reasons for discharge [or] determine that the employer's business judgment or policies do not appeal to its sensibilities. The inquiry is whether plaintiff

has been discriminated against because of his age." *Id.* at 567.

Xerox has asserted a compelling economic justification for the many RIF's which were effected during the four year period. The dramatic, non-competitive position it was in together with a significant loss of market shares signalled the necessity of reducing costs. Although unlike the other defenses available to Xerox, this defense appears to have class wide applicability. Nevertheless, the effectuation of the more than sixty RIF's was carried out and the attendant decisions were made by hundreds and hundreds of local managers.

### 4. *Bona Fide Employee Seniority System*

The ADEA also provides that it is not unlawful for an employer to "observe the terms of a bona fide seniority system ... which is not a subterfuge to evade the purposes" of the Act. 29 U.S.C. § 623(f)(2). To qualify, the system must be based on length of service as the primary criterion and cannot have the effect of perpetuating discrimination based on age prior to the effective date of ADEA. 29 C.F.R. § 860.105(a)–(c) (1986).

In *Trans–World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed. 2d 523 (1985), the Supreme Court addressed TWA's use of the bona fide employee seniority system defense. Under the challenged system, a transfer policy, pilots who became disqualified from serving in that capacity for reasons other than age were automatically able to displace less senior flight engineers. Those pilots displaced due to Federal Aviation Administration maximum age requirements, however, were not afforded the same "bumping" privilege, instead they were forced into bidding procedures set forth in a collective-bargaining agreement. *Thurston,* 469 U.S. at 120, 105 S.Ct. at 621.

TWA contended respondents had failed to make out a *prima facie* case of illegal discrimination. The Court, however, found the claimant's direct evidence on the availability of transfer being dependent on the disqualified pilot's age made the policy dis-

criminatory on its face. *Id.* at 121, 105 S.Ct. at 621–22. Moreover, the Court held TWA's claim that its retirement policy was part of bona fide seniority system to be an affirmative defense. *Id.* at 122, 105 S.Ct. at 622.

As an affirmative defense—admitting of a facial violation of the ADEA, but proferring a justification—the burden shifts to defendant to prove the bona fide nature of the system. Like the BFOQ defense, defendant bears the full burden of justification once the defense has been raised.

While TWA in *Thurston* failed to rebut plaintiff's *prima facie* case with particulars as to each plaintiff, a number of circuits have held for employers raising a bona fide seniority system defense based on individual proofs. In *Morelock v. NCR Corp.,* 586 F.2d 1096 (6th Cir.), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1978), NCR was faced with a suit by present and former employees at its Dayton, Ohio facilities. Plaintiffs alleged, *inter alia,* NCR conducted a reduction in force pursuant to a seniority system which was not bona fide within the meaning of Section 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2). *Morelock,* 586 F.2d at 1099.

Under NCR's system, jobs within the bargaining unit were grouped into vocational classifications, seniority accruing by vocation. Layoffs were conducted on a departmental basis with an employee's seniority providing bumping rights in the event his department was faced with a reduction in force. Plaintiffs challenged the system whereby, classified as senior technicians they were only permitted, pursuant to a collective bargaining contract, to "bump" senior technicians, but not junior technicians whose job qualifications they could meet. *Id.* at 1100–01.

The evidence was uncontroverted NCR had a seniority system which it literally followed in implementing its reduction in force. The Sixth Circuit upheld a grant of judgment *n.o.v.* and held the classifications were based on skill and ability, not age. *Id.* at 1106–07. Similar considerations are presented by the various stack ranking sys-

tems and service/performance matrices used by Xerox.

### 5. *Bona Fide Employee Benefit Plans*

Pursuant to the ADEA, 29 U.S.C. § 623(f)(2), an employer may also observe bona fide employee benefit plans, such as retirement, pension, or insurance plans. However, the statute expressly states no benefit plan may be used as an excuse to fail to hire any individual because of age, or to "require or permit the involuntary retirement of any individual" because of age. 29 U.S.C. § 623(f)(2).

"Since section 4(f)(2) is an exception from the general non-discrimination provisions of the Act, the burden is on the one seeking to invoke the exception to show that every element [of the defense] has been clearly and unmistakably met." 29 C.F.R. § 860.120(a)(1) (1986). The defense has three elements: (1) there must be a bona fide plan, (2) the action must have been taken in observance of its terms, and (3) the plan must not have been a subterfuge to evade the purposes of the ADEA. *EEOC v. Home Insurance Co.*, 672 F.2d 252, 257 (2d Cir.1982). *See also* 29 C.F.R. § 860.120(b)–(d) (1986). A bona fide plan requires the plan must be "accurately described in writing to all employees and ... actually provide[ ] the benefits in accordance with the terms of the plan." 29 C.F. R. § 860.120(b) (1986).

The circumstances surrounding the employment of several members of the sample group illustrate the potential applicability of this defense in the instant action. Martin Cocca was a senior manufacturing engineer with RMG's pesonnel and industrial relations department located in Webster, New York. Cocca was the subject of an IRIF at age fifty-six. He had an annual salary of $35,688. Mr. Cocca alleges his failure to gain promotion and subsequent termination were based upon age. Xerox contends Cocca was subjected to a IRIF based on a matrix rating of Cell "2" and he was "bumped" pursuant to a seniority sys-tem by another older and more highly paid, senior manufacturing engineer. (Compendia at 11.)

Eldon Sheldon, a sales manager with Ginn & Co. in Lexington, Massachusetts, was the subject of a VRIF at age fifty-three, accepting a bridge to retirement with a salary continuance of fifteen months. At the time of his separation Sheldon had an annual salary of $36,888 plus commissions. Sheldon alleges his retirement was forced, based on Xerox's allegedly discriminatory policies. Xerox contends Sheldon rejected redeployment, instead electing to accept the benefits offered under a Ginn & Co. VRIF including a salary continuance. Xerox further asserts Sheldon's duties were absorbed by another sales manager, also a member of the protected category. (Compendia at 52.)

In *Marshall v. Hawaiian Telephone Co.*, 575 F.2d 763 (9th Cir.1978), the Ninth Circuit considered an employee benefit plan which permitted but did not require the employer to retire any employee who reached age sixty. Employees who performed satisfactorily were normally permitted to work until age sixty-five. *Id.* at 764–65. The Secretary of Labor challenged the bona fide nature of the plan on the grounds it "did not adequately notify employees that [the employer] had the option to retire an employee involuntarily at age 60 without regard to his or her performance." *Id.* at 766. The Secretary also asserted that the section 4(f)(2) exception did not apply unless the plan requires retirement at a certain age. *Id.*

The court rejected each of the Secretary's arguments and held that the plan met the requirements of section 4(f)(2). The court noted, "[t]he fact that an employer may decide to permit certain employees to continue working beyond the age stipulated in the formal retirement program does not, in and of itself, render an otherwise bona fide plan [31] invalid insofar as the exception provided in section 4(f)(2) is concerned." *Id.* at 767 (quoting 29 C.F.R.

---

31. The Secretary essentially conceded that the plan was genuine and paid substantial benefits.

*Marshall,* 575 F.2d at 766.

§ 860.110(a) (1977)). *See also Sexton v. Beatrice Foods Co.*, 630 F.2d 478 (7th Cir. 1980).[32] *But see EEOC v. Westinghouse Electric Corp.*, 725 F.2d 211 (3d Cir.1983) (employer's layoff benefits functionally independent of pension plan so that bona fide employee benefit plan defense was inapplicable where employee denied severance benefits and forced to accept early retirement under a collectively bargained pension plan), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984); *EEOC v. Borden's, Inc.*, 724 F.2d 1390 (9th Cir.1984) (rejecting employer's portrayal of severance pay policy as part of bona fide plan and refusing to recognize section 4(f)(2) defense).

Employers must also establish the plan is not a subterfuge to evade the purposes of the ADEA. "[I]n the case of voluntary early retirement plans the employer ... must come up with some evidence that the plan is not a subterfuge to evade the purposes of the ADEA by showing a legitimate business reason for structuring the plan as it did." *Cipriano v. Board of Education*, 785 F.2d 51, 58 (2d Cir.1986). Where the pertinent terms of a plan are adopted subsequent to enactment of the ADEA, proof by the employer of non-aged based reasons for the plan's terms will be required. *Home Insurance, supra,* 672 F.2d at 258–259. Furthermore, where a retirement or benefit plan is strictly optional with the employee it will not be held subterfuge to evade the purposes of the ADEA. *See Mason v. Lister*, 562 F.2d 343, 346 (5th Cir.1977). Similarly, an offer of incentives to retire early is a benefit to the employee where such an offer creates the option of making the employee better off or maintaining a status quo as to his present position. Such an offer does not establish a presumption that early retirement involved any violation of the ADEA. *Henn v. National Geographic Society*, 819 F.2d 824, 828 (7th Cir.1987) (disagreeing with *Paolillo v. Dresser Industries, Inc.*, 813 F.2d 583 (2d Cir.1987)).[33]

### 6. *Waiver*

When an employee has executed a valid release, it may be asserted by the employer as a defense to an ADEA action. *Runyan v. National Cash Register Corp.*, 787 F.2d 1039, 1044 (6th Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 107 S.Ct. 178, 93 L.Ed. 2d 114 (1986). *Runyan* involved the claim of a fifty-nine year old labor lawyer who was confronted with termination for unsatisfactory performance. Raising the spector of an ADEA claim, Runyan negotiated a consulting agreement for a one year term with his employer. The employer refused Runyan's subsequent request to extend the one year term, but agreed to increase the rate of compensation under the existing agreement in exchange for a waiver releasing the employer from any claims arising out of the course or termination of Runyan's employment. After accepting the increased compensation, Runyan proceeded to commence the ADEA action. *Runyan,* 787 F.2d at 1040–41.

The Sixth Circuit analyzed several Supreme Court rulings rejecting waiver under the FLSA and pointed to distinctions in purpose and application between the ADEA and FLSA. The Circuit held an unsupervised release of a claim involving a bona fide factual dispute was valid under the ADEA. *Id.* at 1041–44. *Accord Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66 (6th Cir.1982).

---

**32.** *Sexton* addressed the issue of whether an employer observed the terms of a bona fide retirement plan in terminating an employee, so as to afford protection under the ADEA section 4(f)(2). 630 F.2d at 481. In reversing the district court's grant of summary judgment and denying the applicability of the employer's defense, the court held:

> The question of whether an employer has observe[d] the terms of the plan when it forces an employee to retire must be resolved by examining the provisions of the plan to see

if an employer is expressly permitted to require retirement at a particular age.

*Id.* at 482–83.

**33.** A number of the circuits have held similarly to *Henn, supra. See Gray v. New England Telephone & Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986); *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 344 (D.C.Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir.1982).

In determining whether a release is valid, inquiries are to be made as to the relative bargaining power of the parties and whether the waiver was part of an arms-length settlement of honest differences. Ordinary contract principles are applicable in interpreting the waiver. *Id.* at 1045.

In this case, Albert Evans, a field engineer with BSG in Mundelein, Illinois, was fifty-eight when he executed a request for participation in BSG's bridge to retirement program. The request included a release of claims. Xerox asserts the waiver is valid and constitutes a defense against any claim by Evans. (Compendia at 16.)

In this connection, four former BSG employees, Albert Evans, William Guerds, John Frederick Kenney and Garnet McLean, submitted certifications in opposition to the Xerox motion for decertification concerning and supporting their contention they were coerced into voluntary separation. The facts concerning Mr. Kenney, as asserted by Xerox, demonstrate the viability of the voluntariness issue. It appears in the Fall of 1981, Kenney's position as a product manager for a certain product was designated for elimination. Because of limited field knowledge and the absence of other critical skills, he was identified for termination during the IRIF selection process. However, because he had more than eight years tenure, his name was submitted to corporate headquarters for approval. Xerox corporate headquarters rejected the proposed IRIF of Kenney because of his age and tenure which totaled more than sixty-five years. A sales position was offered to Kenney in Rochester, New York to avoid relocation; however, Kenney was dissatisfied with the Xerox standard compensation scheme and rejected the redeployment offer. Subsequently he elected to accept an IRIF but expressly requested a three month spin-off beyond the usual twelve month salary continuance. Although the corporate policy was contrary to this request, as a special accommodation to him and to reward past service, he was granted an additional three months continuance beyond the twelve months to which he was entitled. (Zribiec [34] Affidavit, ¶ 16.) This example, which is clearly unique to Mr. Kenney, points up facts which argue against plaintiffs' contention that all of the plaintiffs are "similarly situated."

The foregoing circumstances surrounding the claims of proposed class members, Mongiovi, Murray, Cocca, Sheldon, Evans, Guerds, Kenney and McLean, set forth a mere prelude to what would prove to be 1325 individual jury trials to determine defendant's liability to each plaintiff. To proceed in a class action with the defenses for each of the 1325 members of the proposed class on *seriatim* basis, is to defeat the purposes of a class action. Consolidation of these claims into a representative class with the attendant defenses would not provide for an efficient proceeding for the resolution of what appears to be 1325 distinct cases.

### E. *Fairness and Procedural Considerations*

To proceed without permitting Xerox to raise at the liability stage of trial each and every defense available to it where each potential class member is readily identifiable and must step forward in order to assert and prove an individual claim for liability or at least be the subject of a defense particular to each such plaintiff would deprive defendant of the Fifth Amendment right to due process.[35] The central meaning of due process is simple: "parties whose rights are to be affected are entitled to be heard." *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233, 17 L.Ed. 531 (1863). The opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Accordingly, even with the rejection of plaintiffs' contention concerning trial procedure, serious questions arise concerning the fairness, manageability and

---

**34.** Donald A. Zrebiec was Vice President, Personnel, for the BSG from 1979 to 1984.

**35.** This is the procedure plaintiffs contend, pursuant to *Teamsters,* should be followed in this case. See generally the discussion of this contention, *infra.*

meaningfulness of 1325 separate jury trials under the guise of a class action before a single jury.

The Supreme Court has held a civil cause of action to be a species of property protected by the Due Process Clause. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982) (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). A statutorily created cause of action includes any substantive defenses created thereunder. *See Martinez v. California,* 444 U.S. 277, 282 and n. 5, 100 S.Ct. 553, 557 and n. 5, 62 L.Ed.2d 481 (1980). Accordingly, plaintiffs' suggested interference [36] with the right of Xerox to defend against a claim in a meaningful way amounts to a deprivation of property violative of the Fifth Amendment. *Webster v. City of Houston,* 735 F.2d 838, 846 (5th Cir.1984) (Williams, J. dissenting). *See also, Baldwin v. Hale, supra,* 68 U.S. (1 Wall.) at 233 ("Common justice requires that no man shall be condemned in his person or property without notice and an opportunity to make his defence.")

In *Logan v. Zimmerman Brush Co., supra,* Logan, a former employee of the Zimmerman Brush Company, filed a discrimination charge under the Illinois Fair Employment Practices Act ("FEPA") alleging he had been unlawfully terminated. Pursuant to FEPA, the Illinois Fair Employment Practices Commission then had one hundred twenty days within which to conduct a fact-finding conference. However, apparently through inadvertence, the Commission scheduled the conference after the expiration of the mandated time limit. *Logan,* 455 U.S. at 426–27, 102 S.Ct. at 1152–53.

The Commission denied the employer's motion to dismiss the charge for failure to hold a timely conference. On appeal, the Illinois Supreme Court reversed, rejecting Logan's argument that dismissing the charge and thereby extinguishing his cause of action would violate his right to due process under the Fourteenth Amendment. *Id.* at 427–28, 102 S.Ct. at 1153–54. The Illinois Supreme Court found the 120–day period a mandatory requirement of the legislature.

On appeal the Supreme Court applied a two-part test: whether Logan was deprived of a protected interest, and, if so, what process was his due. *Id.* at 428, 102 S.Ct. at 1153. Answering the first inquiry in the affirmative, the Supreme Court found the FEPA procedural limitation had deprived Logan of a property right—his ability to assert his rights. *Id.* at 433, 102 S.Ct. at 1156. Turning to what process was due, the Court found Logan was entitled to some form of hearing. Specifically "to have the Commission consider the merits of his charge ... before deciding whether to terminate his claim." *Id.* at 434, 102 S.Ct. at 1157.

There is no significant substantive distinction between *Logan* and the case at bar. The statutorily created defenses available to Xerox constitute a protected property interest under the Fifth Amendment just as Logan's cause of action under state law created a protected property interest under the Fourteenth Amendment. To hold otherwise is to deny Xerox the use of established adjudicatory procedures. In assessing what process is due Xerox, *Logan* is again on point. Quoting from *Bell v. Burson,* 402 U.S. 535, 541, 91 S.Ct. 1586, 1590, 29 L.Ed.2d 90 (1971), the *Logan* Court stated: "When a 'statutory scheme makes liability an important factor in the state's determination ...,' the state may not, consistent with due process, eliminate consideration of that factor in its prior hearing'." *Logan,* 422 U.S. at 433, 102 S.Ct. at 1156.

In the instant case, plaintiffs' urge the proper procedure is to allow a jury trial on the issue on classwide liability and then allow Xerox to raise individual defenses in the context of "remedial/damage mini-trials", subsequent to establishment of classwide liability.[37] However, because Con-

---

**36.** See January 9, 1987 Transcript of oral argument at 36 to 49.

**37.** Plaintiffs' counsel points to *Mount Healthy Board of Education v. Doyle,* 429 U.S. 274, 97

gress has included certain defenses within the statutory scheme of the ADEA, it is contrary to due process to prevent their utilization by a defendant in the liability phase of the trial. Accordingly, plaintiffs assertion that Xerox should raise its defenses at the remedial/damage phase of the trial, subsequent to establishment of class wide liability, is inconsistent with the constitutional right of Xerox to defend itself in this matter as well as plainly unworkable and intolerable.

The ADEA permits class actions only where employees are similarly situated in order that a defendant be afforded an opportunity to effectively defend. Requiring less would preclude Xerox from asserting defenses available under the statute, and amount to a deprivation of a property right in violation of the Due Process Clause and is contrary to the decision in *Gavalik v. Continental Can Co., supra.* The provisions for an ADEA class contemplate a situation where plaintiffs allege a violation under a common policy or practice of the employer, and presuppose a similar defense, if any, being raised against the class claim. As previously set forth, such is not the status of the instant case.

Plaintiffs have alleged a discriminatory policy under the ADEA and Xerox asserted defenses which are varied as to the circumstances of each plaintiff.[38] The action taken by Xerox cannot be referred to as a single RIF. There were more than sixty RIFs occurring over a four year period which were conducted and implemented by thousands of local supervisors pursuant to varying procedures. The facts of the RIFs together with the fact that Xerox will defend plaintiffs' claims on an individual basis, asserting any one or more of many defenses in a method consistent with the ADEA, foreclose the possibility of the proposed class claimants going forward as similarly situated.

Plaintiffs repeatedly urge the court to permit the instant action to proceed in a fashion similar to *Teamsters.* In *Teamsters,* the Government brought an action alleging the company engaged in a pattern or practice of discriminating against minorities, specifically blacks and Spanish surnamed individuals. The disparity in treatment involved the company's alleged refusal to recruit, hire, transfer, or promote minority group members on an equal basis with non-minorities, particularly with respect to so-called line-driver positions. The ultimate factual issues were whether there was a pattern or practice of such disparate treatment and whether those differences were racially motivated. *Id.* 431 U.S. at 335, 97 S.Ct. at 1854.

The company offered a number of defenses to the discrimination charges:

> The company's principal response to this [statistical] evidence [was] that statistics can never in and of themselves prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the [statistical] figures.

*Id.* at 339, 97 S.Ct. at 1856.

> The company concede[d] that its line drivers were virtually all white in July, 1965, but it claims that thereafter business conditions were such that its work force dropped. Its argument [was] that low personnel turnover, rather than post-Act discrimination, accounts for more recent statistical disparities. It point[ed]

---

S.Ct. 568, 50 L.Ed.2d 471 (1977) as analogous to the case at bar. (Transcript of Hearing, February 20, 1987, at 11:16–12:1.) However, the principle established by the Supreme Court in *Mount Healthy* holds once an employee has shown protected conduct played a substantial roll in the employer's decision not to rehire, the employer is *entitled to show* "by a preponderance of the evidence that it would have reached the same decision as to respondent's re-employment even in the absence of the protected conduct." *Id.* at 287, 97 S.Ct. at 576. *See also Givhan v. Western Line Consolidated School Dis-*

*trict,* 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979) (reaffirming that employer required and entitled to defend and quoting *Mount Healthy, supra* ).

**38.** There is no basis to assert, infer or even suggest Xerox has raised such defenses in bad faith or that they are illusory. Clearly, plaintiffs contest the merits of the various defenses. However, the concern presently is not with merits but with the availability and to a lesser extent the viability of the defenses.

to substantial minority hiring in later years, especially after 1971, as showing that any pre-Act patterns of discrimination were broken.

*Id.* at 341, 97 S.Ct. at 1857.

The company's narrower attacks upon the statistical evidence—that there was no precise delineation of the areas referred to in the general population statistics, that the Government did not demonstrate that the minority populations were located close to terminals or that transportation was available, that the statistics failed to show what portion of the minority population was suited by age, health, or other qualifications to hold trucking jobs, etc.—[were] equally lacking in force.

*Id.* at 342, n. 23, 97 S.Ct. at 1858, n. 23.

The company's evidence, apart from the showing of recent changes in hiring and promotion policies, consisted mainly of general statements that it hired only the best qualified applicants.

*Id.* at 342–43, n. 24, 97 S.Ct. at 1858, n. 24. Accordingly, the company did not assert or seek to establish an individual defense for each member of the class. Rather, the defense asserted was a classwide and not an individual plaintiff-by-plaintiff defense, as Xerox has asserted in the instant matter.

In *Teamsters*, the Supreme Court noted:

The employer's defense must, of course, be designed to meet the prima facie case of the Government. *We do not mean to suggest that there are any particular limits on the type of evidence an employer may use.* The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking. While a pattern might be demonstrated by examining the discrete decisions of which it is composed, the Government's suits have more commonly involved proof of the expected result of a regularly followed discriminatory policy.

*Id.* at 360–61, n. 46, 97 S.Ct. at 1867, n. 46 (emphasis added). While this language

does not limit a defendant in its defense it notes the focus is not usually on individual hiring or firing or promotion decisions. In the context of *Teamsters*, the so-called pattern-or-practice was just that—a blanket application to all individuals. As noted, the company did not seek to demonstrate a defense individual by individual, as is argued and advanced by Xerox.

Recent holdings in this circuit undercut plaintiffs' desire to leave Xerox to its defenses on the remedial/damage stage of the trial. Clarifying the separation between the phases of a Title VII case as to when burdens shift, the Third Circuit has held where a class representative establishes disparate treatment as the employer's standard practice, the class is entitled to injunctive relief barring continuation of the discriminatory practice. *Dillon v. Coles,* 746 F.2d 998, 1004 (3d Cir.1984) (citations omitted). However, as to individual members of the class, the burden of proof as to liability remains, requiring a showing that "each was an actual victim of discrimination." *Id.*

The court went on to hold:

[I]n a class action after the *individual* has presented his prima facie case, placing the burden on the employer 'to demonstrate that the *individual* applicant was denied an employment opportunity for lawful reasons', (citing *Teamsters,* 431 U.S. at 362 [97 S.Ct. at 1868]) is entirely consistent with the *Burdine* allocation of burdens in a suit brought by an individual plaintiff.

*Id.* (emphasis added).

The recent decision of the Third Circuit in *Gavalik v. Continental Can Company, supra,* applied in the context of the Employer Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), clarifies the parsing of burdens discussed in *Dillon. Gavalik* concerned two separate class actions alleging the institution and implementation of a liability avoidance scheme by Continental Can to prevent its employees from attaining employee benefits in violation of section 510 of ERISA, 29

U.S.C. § 1140 (1982).[39]

In *Gavalick*, the Third Circuit noted the *McDonnell Douglas/Burdine* shifting burdens mechanism is applicable where "specific intent to discriminate will not be demonstrated by 'smoking gun' evidence." *Id.*, 812 F.2d at 852, 853. In such circumstances, the class plaintiffs' burden in discrimination cases may be satisfied by circumstantial evidence, if a *prima facie* case is established by a preponderance of the evidence. In this event the burden of production then shifts to the employer to introduce admissible evidence of a legitimate, nondiscriminatory reason for its actions. *See Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Teamsters*, 431 U.S. at 360 n. 46, 97 S.Ct. at 1867 n. 46; *Gavalik*, 812 F.2d at 853; *Dillon*, 746 F.2d at 1004.

If the employer fails to carry its burden, the presumption created by plaintiff's *prima facie* case of the prohibited discrimination remains and the court must enter judgment for the class. However, if the employer carries its burden, the class representatives have the opportunity to show the employer's reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The shifting burdens mechanism is not applicable, however, "[w]here the plaintiffs' case does consist of *direct* 'smoking gun' evidence that the employer acted with discriminatory motivation...." *Gavalik*, 812 F.2d at 853 (emphasis in original text).

In *Gavalik* the class did in fact have direct, smoking gun evidence of the employer's discriminatory motivation in certain liability avoidance programs.[40] By contrast, after twenty months of extensive discovery, plaintiffs have not found the smoking gun, the direct evidence of discriminatory motive in this case. The present lack of direct evidence is more than academically significant. If direct evidence of discriminatory motivation existed, Xerox would not be permitted to merely articulate legitimate nondiscriminatory reasons for its actions in response to a *prima facie* case established by plaintiffs. *Gavalik*, 812 F.2d at 853; *Bell v. Birmingham Linen Serv.*, 715 F.2d 1552, 1556–57 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir.1982). However, Xerox is not so limited in this case because of the lack of direct evidence to support plaintiffs' claims.

The *Gavalik* class, as does the conditional class herein, argued two distinct stages in employment discrimination class action trials, as recognized by *Teamsters*. Plaintiffs, both in *Gavalik* and in this matter, contend the initial or liability stage of trial requires only proof that a discriminatory policy existed (*Teamsters*, 431 U.S. at 360, 97 S.Ct. at 1867); they further contend that at the second or remedial/damages stage of trial the question of an individual's entitlement for relief arises. *Id.* at 361, 97 S.Ct. at 1867; *Gavalik*, 812 F.2d at 859. Accordingly, both classes of plaintiffs contend the liability phase ends upon a showing of class wide discriminatory violation and that all causation/defense issues are reserved for the remedial/damages phase of trial. This is incorrect. *Id.* at 860–64.

The *Dillon* court indicated several years ago that in a class such as the matter presently before the court "the liability phase of the case is not concluded until the [individual class member] ... demonstrates his own basis for an award." 746 F.2d at 1004.

It is misleading to speak of the additional proof required by an individual class member for relief as being part of the damages phase; that evidence is actually an element of the liability portion of the case. Until the individual has demonstrated actual injury to himself, the court may not direct individual relief. *Id.*

The *Gavalik* court noted the additional proof referred to in *Dillon* consists of a

---

**39.** "[T]he essential element of proof under § 510 is specific intent to engage in proscribed activity." *Gavalik*, 812 F.2d at 851.

**40.** See *Gavalik*, 812 F.2d at 840–42 for a detailed description of the direct evidence.

showing that "vacancies or opportunities for employment or advancement existed." 812 F.2d 862 n. 44. Specifically, after the ERISA class representatives proved the class entitlement to injunctive relief,

> an individual class claimant need only show that s/he was eligible for break-in-service pensions, was available for work, designated as permanently laid off and laid off prior to vesting. As to why s/he was laid off, as noted in *Teamsters,* "the employer [i]s in the best position to show why any individual employee was denied an employment opportunity."

*Id.* (citation omitted). Accordingly, even in a direct evidence Gavalik type of case, plaintiffs must carry the burden of persuasion on the ultimate issue which "remains at all times with plaintiff[s]." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Nevertheless, even in the face of such a direct evidence case, defendant has the right to defend, and assert each of its defenses, at the liability stage of trial.

In this case the only evidence plaintiffs have is circumstantial—the statistical data. Thus, the burdens in this case are as described in *McDonnell Douglas/Burdine* and *not* as apportioned in *Gavalik.* Notwithstanding and contrary to plaintiffs' contention, the defenses which Xerox asserts to plaintiffs' claims are part of the liability stage of the trial. The prosecution of these defenses will not be part of the remedial/damage stage which plaintiffs contend should be conducted by a special master.

The burden which Xerox must carry in light of plaintiffs' circumstantial evidence is the simple articulation or production of legitimate, nondiscriminatory reasons for its actions. Xerox may, however, wish to place before the jury a *seriatim* defense, class member by class member and not simply articulate or produce admissible evidence but rather prove its legitimate reasons for the separation of each plaintiff as well as proving the absence of a discriminatory company wide policy.

Recognizing both *Dillon* and *Gavalik* to be cases arising outside an ADEA context, it is nonetheless clear the holdings announced by *Dillon* and confirmed, as applied in an ERISA context, by *Gavalik* are instructive here. Class actions under ERISA and Title VII both fall under Rule 23. A Rule 23 class, by definition, is open ended because potential class members may opt-out. In contrast, a class is formed under the ADEA by individuals "opting-in", creating a definite class of identifiable individuals. Therefore, because liability must be demonstrated by each individual class member prior to moving to the second, remedial/damage stage of a *Teamsters* proceeding in a Title VII or ERISA context where an undetermined number of class members could theoretically demonstrate liability, the same reasoning holds true here where, in an ADEA context, a definite and predetermined number of class plaintiffs also raise claims of employment discrimination. Where each individual class member must come forward in order to prove causation prior to any finding of liability to that class member and where in each instance Xerox has the possibility of raising any one of the several defenses previously outlined, plaintiffs cannot be deemed similarly situated so as to constitute a class under the ADEA.

These considerations are highlighted in *Elliott v. Group Medical & Surgical Service, supra,* where six former employees brought an ADEA suit against their employer. The judgment for plaintiffs was reversed on appeal. The Fifth Circuit held the evidence that all plaintiffs were over the age of forty and were replaced by younger employees was insufficient to support a finding of willful age discrimination in view of the employer's evidence demonstrating each discharge resulsted from a corporate reorganization designed to increase management efficiency. 714 F.2d at 566.

While noting the contention of plaintiffs that age was the most likely reason for the discharge of each of them, the court reviewed the employer's asserted justification for each termination. Specifically, it was noted the employer:

> introduced evidence that the reason for Galen's discharge was a perceived disloy-

alty because he had sought to undercut his immediate superior, approaching Hachmeister with a "resume" of things to be accomplished were he to succeed that superior. Elliott was fired, it contends, because his region had not achieved the company's desired market penetration or productivity, the undisputed fact being that the market penetration there (in Houston) was approximately five to six percent, as compared to the company's state-wide market penetration of twenty percent. As to the others, its contentions are as follows: Owens was terminated because it was believed that he did not have the necessary inner drive to lead his region and that his replacement would do a better job. The record reflects that during the three years preceding Spradley's termination he had been transferred into and out of a total of four different positions, with the final transfer, Manager of National Accounts, being a decided demotion. Appellant urges that Spradley simply lacked the personality to deal with others in managerial positions and had demonstrated that he did not have the capabilities or desire to be Manager of National Accounts. Thompson was dismissed because he had not developed a sales training program. The record reflects, and Thompson conceded, that the sales training program had "really been neglected," but that he "was going to recommend changes" to "revitalize the program." The reason stated for Tipton's termination was that he had violated company policy by having a contractor who was remodeling his new regional offices leave out a wall, producing the twin effect of enlarging his personal office beyond the square footage permitted by the company for an officer of his rank and eliminating the employees' lounge.

*Id.* None of these quoted reasons was found to be either irrational or idiosyncratic. *Id. See Teamsters,* 431 U.S. at 360 n. 46, 97 S.Ct. at 1867 n. 46.

The proffer of such justification for termination of an employee or a number of employees means the trier of fact is not free to disregard such reasons without competent evidence to demonstrate the reasons were not true as a matter of fact or that the explanation did not motivate the discharge or that the reasons were insufficient to motivate the discharge. *La Montagne v. American Convenience Products, Inc., supra,* 750 F.2d at 1414–15. In any event, the reasons advanced are, in this case, particular to the individual members of the proposed class. The evidence of pretext will turn on the circumstances of the individual class members. At this point plaintiffs have offered only mere conclusions and subjective beliefs of age based discrimination.[41]

## F. ADEA Filing Requirements

The ADEA requires that all plaintiffs file timely charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") before commencing an action. 29 U.S.C. § 626(d).[42] The "timely

---

**41.** Plaintiffs have offered statistical data and expert opinions based upon statistical data. However, this does not address the similarly situated requirement. Each plaintiff will be forced, at the least, to defend against the justification asserted by Xerox and thereafter demonstrate such a justification is a mere pretext concerning that plaintiff. Moreover, the fact that a reduction in force reduces the average age of the remaining employees does not support an inference that a particular employee was fired because of age. *Kier v. Commercial Union Insurance Co.,* 808 F.2d 1254, 1258 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987).

**42.** 29 U.S.C. § 626(d) states:
*No civil action may be commenced* by an individual under this section *until* 60 days

*after a charge* alleging unlawful discrimination *has been filed* with the Equal Employment Opportunity Commission. *Such a charge shall be filed—*
  (1) within 180 days after the alleged unlawful practice; or
  (2) in a case to which section 633(b) of this title applies, *within 300 days after the alleged unlawful practice occurred,* or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.
Upon receiving such a charge, the Commission shall promptly notify all persons named in such charge as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by infor-

charge" period is a maximum of "within 300 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(2). Accordingly, the plain language of this section provides that all individuals in this matter who did not file charges with the EEOC (or an appropriate state agency) within, at most, 300 days of the occurrence of their termination (the alleged discriminatory practice) are time barred by the ADEA from proceeding with this complaint. Xerox has raised a series of affirmative defenses in this regard. *See,* Xerox Answer, January 16, 1984, First, Third, Fifth and Thirteenth Affirmative Defenses.

The language of the ADEA requiring a timely filing uses the word "shall"; the language is not permissive. A timely filing is a strict requirement, a "prerequisite to all actions under [the] ADEA." *Foster v. CBS Records, Div. of CBS, Inc.,* 109 F.R.D. 168, 169 (S.D.N.Y.1986). It *appears* plaintiffs are seeking a broad exception to the filing requirement of ADEA and in essence argue that the proposed class plaintiffs who failed to timely file may attach their claims onto the timely charges of their coemployees by using the "opt-in" procedure of the FLSA. 29 U.S.C. § 216(b) This relief was granted in *Anderson v. Montgomery Ward & Co.,* 631 F.Supp. 1546, 1550 (N.D.Ill.1986) (Ward II), *original petition to appeal filed* January 20, 1987, *motion granted,* No. 87–1297 (7th Cir. Feb. 11, 1987), argument scheduled October 28, 1987.[43]

The broad remedial nature of ADEA does not create "piggybacking" procedures which Congress did not write into the statute. Moreover, the remedial nature of ADEA does not obviate the timely statutory filing requirements. *See, e.g., Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986) (reference to the plain language of the statute itself, not the "'broad' purposes of legislation" determines the purpose of the language). "Congress adopted a clear rule and policy to bar claims that were not promptly presented to EEOC in the form of a charge." *Foster,* 109 F.R.D. at 170.

In refusing to sanction a piggyback scheme, the Eighth Circuit in *Kloos v. Carter–Day Co.,* 799 F.2d 397 (8th Cir.1986) held the administrative filings of ADEA plaintiffs who fail to allege classwide discrimination or claim to represent a class may not serve as a basis for jurisdiction over opt-in class plaintiffs who never filed administrative charges. *Id.* at 399. *Kloos* specifically rejected the holding and reasoning of the district court in *Ward II.* The Circuit reasoned that to allow "class actions without administrative charges that fairly anticipate class claims, would undermine the notice and conciliation purposes of the filing requirement." *Id.* at 400.

Of the proposed class plaintiffs in this case, those who did not timely file charges cannot be said to be similarly situated to the plaintiffs who in fact filed timely charges. As the court in *Foster, supra,* stated:

> To allow those barred claims to be revived merely because plaintiff, or her lawyer, consider it advantageous to wield a heavier club by suing on behalf of a large number of claimants would undermine the purposes and requirements of the statute. It would further give unfair extortion power to a single claimant, who can threaten, by the mere insertion of a few words in her complaint, to resuscitate claims of others that have lapsed and cannot be revived without her as a representative.

109 F.R.D. at 171. Similarly, to allow plaintiffs or their lawyers to now sue on behalf of this extraordinary number of Xe-

---

mal methods of conciliation, conference and persuasion. (Emphasis added.)

**43.** In *Anderson v. Montgomery Ward & Co.,* 40 E.P.D. 43,428 (N.D.Ill.1986) (Ward I) just the opposite result obtained. The court noted that the case was "not a class action," and that none of the timely-filed charges or complaints suggested that the action was brought "on behalf of others;" the court ruled that "each plaintiff [must] file a timely charge for discrimination with the EEOC". *Id.* at 43,430. Accordingly, the court held that the seven plaintiffs who failed to file timely charges could not "piggyback" their civil actions on the timely EEOC filings of the other plaintiffs.

rox employees and former employees who may not have complied with ADEA's strict filing requirements would sanction "unfair extortion power" which was neither drafted into this statute nor intended by Congress. See, *Price v. Maryland Casualty Co.*, 62 F.R.D. 614, 615 (S.D.Miss.1972), *aff'd*, 561 F.2d 609 (5th Cir.1977) (limiting the proposed class "to individuals similarly situated to Price, who filed the required notice" in a timely manner and who have opted into the action).

Accordingly, the Xerox employees or former employees who failed to effect the required filing are not similarly situated to those plaintiffs who timely filed; to this extent these employees may not invoke section 16(b) of the FLSA to opt into this claim. As the court in *Ward I* initially determined, that case was "not a class action. None of the plaintiffs who filed EEOC charges did so purporting to represent other employees similarly situated." 40 E.P.D. at 43,430. *See also, Kloss, supra*, 799 F.2d at 399. It appears the same situation is presented here.

The *Kloos* court found significance in the fact that administrative charges of the timely filed plaintiffs, like those in this case, "set[ ] forth only *personal* claims of discrimination," and did not "fairly anticipate class claims." *Id.* at 400 (emphasis added). *See Naton v. Bank of California*, 649 F.2d 691, 697 (9th Cir.1981). In such a situation, the plaintiffs are "unquestionably barred," because they have not "brought timely charges with the EEOC." *Foster, supra*, 109 F.R.D. at 170. *See also Hopper v. Timex Corp.*, 595 F.Supp. 668, 670 (E.D.Ark.1984) (plaintiff's EEOC charge, limited to claim of individual unlawful discharge, found to be insufficient as a jurisdictional foundation for ADEA class action).

Significantly, the four originally named plaintiffs, Lusardi, Weiss, Hill and Marr, each filed a charge of discrimination which was received by the New Jersey District Office of the EEOC on January 7, 1982. Each of these charges of discrimination is identical with the exception of the personal information concerning the individuals. With regard to the information set forth in the "particulars" section, all of such information concerns the personal claims of discrimination with regard to the named individuals. None of the charges gives notice that the filing is on behalf of the individuals and "others similarly situated." In this connection, references in the filings made to "criteria ... structured to eliminate persons such as [the claimant] over forty years old who were perceived by Xerox to be persons too old to be trained in other positions or job openings in the Xerox organization," and to the allegation that Xerox engaged and continued to engage in employment practices to discriminate against persons over forty as a class, do not suggest the charge of discrimination concerned any person other than the individual named in the filing.

The decisions in *Mistretta v. Sandia Corp.*, 639 F.2d 588 (10th Cir.1980) (overruled on other grounds by *Trans–World Airlines v. Thurston, supra*) and *Bean v. Crocker National Bank*, 600 F.2d 754 (9th Cir.1979) involve facts where at least one timely-filed administrative charge alleged class-wide claims. The Ninth Circuit in *Naton v. Bank of California, supra*, distinguished the facts therein from those in *Bean* and considered crucial that "at least one complainant complied with the literal requirements" of section 626(d) and that an administrative filing gave notice that the action would be on behalf of "others similarly situated." *Naton*, 649 F.2d at 697. Accordingly, in all of these decisions, there was a recognition of the strict filing requirements.

It *presently appears* the named plaintiffs did not file on behalf of "others similarly situated" when their filings were effected with the EEOC. To the extent such filings were not effected, the named plaintiffs are not similarly situated with those members of the proposed class who did not effect timely filings on their own behalf.[44]

---

**44.** Similar considerations are presently before the Seventh Circuit in *Montgomery Ward v. Anderson.* See text accompanying footnote 43, *supra.* Nevertheless, it is significant one of the

## V. CONCLUSION

There are numerous valid defenses which are available to Xerox and which appear to have been asserted in good faith. Although it may be argued there is common theory of recovery concerning the affirmative claims of each individual plaintiff under ADEA, such commonality ends when the defenses and the unique circumstance of each plaintiff are considered.

Questions of law vary with regard to the facts supporting each proposed class member's individual claim, as well as to the facts opposing each class member's claim. Viewed in this light, questions of law or fact may differ markedly among those potential class members terminated via a VRIF as opposed to those class members terminated via an IRIF as opposed to those class members who remain active and allege demotion or a denial of promotion, or those class members who resigned and/or signed a waiver or release.

With regard to an inquiry as to whether the claims of the class representatives, and indeed the fifty-one sample plaintiffs, are typical of the claims of the class, again, the answer is in the negative. It appears the named plaintiffs are in no way fully representative of the claims asserted by the randomly selected sample group. The named plaintiffs represent but two of eight employment situations demonstrated within the sample group. The named plaintiffs are representative of only those members subject to IRIFs or VRIFs between the years 1980 and 1982 who are claiming either forced retirement or involuntary reduction in force as violative of the ADEA. The representative plintiffs were employed in only seven of the seventeen organizations employing the other fifty-one sample plaintiffs.

In contrast, the sample group employment includes people subject to VRIFs and IRIFs as well as active employees, voluntary terminations seeking other employment, permitted resignations, involuntary terminations and retirements. Plaintiffs in the sample group also allege a panoply of claims not raised by the named plaintiffs, including, but not limited to, denial of promotion, demotion, denial of sales territory and forced resignation. As well, the sample fifty-one also include a number of individuals whose claims fall outside the class time period represented by the named plaintiffs.

With regard to the conduct of Xerox in effecting reductions in its work force, it cannot be said that Xerox acted on grounds which are generally applicable to the class. A review of the employment status of each of the sample group and named plaintiffs demonstrates this. Even assuming consistent action regarding both IRIF and VRIF terminations, Appendix A reveals eight active employees alleging either denial of promotion or demotion. Discovery also revealed a number of involuntary terminations for cause, noting in one instance a termination for flagrant disregard of company interests regarding forged medical records. Moreover, with regard to terminations by Xerox as reflected in Appendix

---

reasons for the ADEA's filing requirement is to provide the EEOC with an opportunity to eliminate unlawful practices through informal methods of conciliation. H.R.Conf.Rep. No. 950, 95th Cong., 1st Sess. 12, reprinted in 1978 U.S. Code Cong. & Ad.News 504, 528, 534. See also *Kloos,* 799 F.2d at 400; *Ward II,* 631 F.Supp. at 1540; *Foster,* 109 F.R.D at 170. Conciliation is not an empty phrase; it is a means of resolving disputes. The ADEA's strict filing requirements properly facilitate that resolution. Moreover, adherence to the strict filing requirements will prevent contrived accusations. Specifically, a compelling reason to adopt the strict filing requirement is to "limit[ ] the chances for the filing of suits based on subsequent motivations or reassessments." *Kloos,* 799 F.2d at 400. The court in *Foster,* after noting that the ADEA's

charge filing requirements "seek to prevent subsequent contrived accusations from serving as the basis of court actions," explain a practical consideration concerning "piggybacking":

Plaintiff wishes to send notices to these persons advising them of her lawsuit and inviting them to join. It can be expected that most or all of them will become convinced upon receipt of plaintiff's notice that he or she was a victim of age discrimination and will opt into plaintiff's suit. Although they never made a charge and would now be barred from bringing their own suit, the bar would disappear only because plaintiff now choses to designate her court complaint as a class action. I see no reason why this should be so. 109 F.R.D. at 170.

A, in twenty-six cases Xerox had taken some form of corrective action with regard to the employee's performance.

Concerning IRIF terminations, Xerox charges and, the discovery to date seems to bear out, decisions to include an employee in the category were made by a diverse a group of supervisors. A determination as to the inclusion of an employee in an IRIF or even the instigation of a VRIF was made at the local level and had the input of hundreds of local supervisors—in the case of the sixty-four individuals in the sample group sixty-two different supervisors were involved. Accordingly, based on discovery and data presently available, it appears the various actions by Xerox were based upon grounds not generally applicable to the class but rather individualized to the employee.

Plaintiffs argue in effect that the simple filing of a complaint in which plaintiffs seek recovery on behalf of themselves and all other similarly situated based upon alleged violations of ADEA by definition satisfies the "similarly situated" requirement. If this were in fact the case, judicial determination of the similarly situated requirement would not be necessary. All that would be necessary would be the mere filing of the complaint, together with a certification that such allegations were indeed made and such relief sought. Congress did not intend for such a procedure to be followed.

ADEA is specific in its requirements with regard to filing the necessary charge in the specified time period, with its intent to effect conciliation and with the defenses provided to employers. Moreover, Congress specifically selected the opt-in class action of FLSA rather than an opt-out Rule 23 class action. In substance, specific requirements were designed into the statute. The ADEA calls for and demands a class of similarly situated individuals, which determination is judicial in nature. Accordingly, this case is not suitable for treatment as a class action. Therefore, the Xerox motion to decertify is granted. The remaining motions filed by plaintiffs are moot.

Counsel for Xerox are to submit an appropriate form of order.

APPENDIX A

"SIMILARLY SITUATED" FACTORS

* Original Named Plaintiff
** Additional Named Plaintiff
*** Claim Outside Class Time Period
**** Xerox Best Estimate; Claimant Failed To Respond To Interrogatories

| NAME | HIRE DATE (AGE) | TENURE | TITLE | GRADE/ SALARY | ORGANIZATION | LOCATION | LAST SUPERVISOR | LAST PROMOTION DATE (AGE) | CORRECTIVE ACTION | EMPLOYMENT STATUS | SEPARATION DATE | CLAIM *** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hill, Walter* | 3/16/70 - (43) | 11 Yrs, 8 Mos. | Document Distribution Major Account Representative A | Grade 10, $21,232 + Commission/Yr. | OPD, Northeast Region, New York City Sales District | New York, New York | S. Cobca | N/A | Yes | IRIF | 11/6/81 | IRIF Termination |
| Lunardi, Jules* | 12/5/66 - (26) | 14 Yrs, 11 Mos. | Document Distribution Major Account Representative A | Grade 8, $20,736 + Commission/Yr. | OPD, Northeast Region, Metro Sales District | Morris Plains, New Jersey | J. McCann | N/A | Yes | IRIF | 11/6/81 | IRIF Termination |
| Marx, James* | 12/16/63 - (31) Rehire 4/1/79 - (46) | 15 Yrs, 6 Mos; 2 Yrs, 5 Mos. | Document Distribution Major Account Representative A | Grade 10, $26,748 + Commission/Yr. | OPD, Northeast Region, Metro Sales District | Greenwich, Connecticut | J. McCann | N/A | Yes | IRIF | 11/6/81 | IRIF Termination |
| West, John* | 3/15/67 - (45 Yrs, 11 Mos.) | 14 Yrs, 6 Mos. | Document Distribution Major Account Representative A | Grade 10, $21,212 + Commission/Yr. | OPD, Northeast Region, New York City Sales District | Woodbury, New York | S. Cobca | N/A | Yes | IRIF | 11/6/81 | IRIF Termination |
| Brickman, Arthur** | 4/27/66 - (32) | 16 Yrs, 6 Mos. | Audit Principal III | Grade 12, $54,036/Yr. | Corp. Audit And Operational Analysis | Rochester, New York | R. Bernard | 12/1/73 - (40); 4/1/74 - (43) | No | IRIF | 11/8/82 | IRIF Termination |
| Cocca, Marus** | 6/15/71 - (45) | 11 Yrs, 3 Mos. | Senior Mfg. Engineer | Grade 9, $35,688/Yr. | RMG, NAMD, New Build Operations, Personnel & Industrial Relations | Webster, New York | J. Rachman | 2/16/73 - (44) | No | IRIF | 9/13/82 | IRIF Termination |
| Hrisko, Carl** | 4/10/72 - (34) | 10 Yrs, 4 Mos. | Technician I | Grade 12, $23,538/Yr. | RBG, Low Volume SBU | Webster, New York | D. Cole | 1/18/82 - (45) | No | IRIF | 8/16/82 | IRIF Termination |
| Loye, Raymond** | 6/24/68 - (35) | 12 Yrs, 5 Mos. | Patent Attorney IV | Grade 15, $56,760/Yr. | Corporate OGC, Patent Department | Rochester, New York | C. Green | N/A | No | IRIF | 11/14/80 | IRIF Termination |
| Miller, Donald** | 6/12/67 - (27) | 15 Yrs, 4 Mos. | System Project Manager | Grade 11, $44,988/Yr. | BSG, Information Systems Div., Customer Adm. Systems Organization | Rochester, New York | R. Donovan | N/A | No | IRIF | 11/1/82 | IRIF Termination |
| Paterson, Robert** | 6/25/67 - (40) | 15 Yrs, 5 Mos. | Facilities Design Draftsman | Grade 13, $30,368 | RMG, NAMD, Plant Engineering & Maintenance | Webster, New York | N. Parr | N/A | No | VRIF | 11/30/82 | Alleged Forced Retirement |
| Salvatore, Anthony** | 8/19/68 - (26) | 14 Yrs, 2 Mos. | Pricing Administration Program Manager (OPD Product Line) | Grade 11, $59,856/Yr. | BSG, Information Systems Div., Customer Adm. Systems Organization, Pricing Administration | Rochester, New York | T. Lux | N/A | No | IRIF | 11/1/82 | IRIF Termination |
| Sheldon, Eldon** | 8/1/63 - (34) | 19 Yrs, 2 Mos. | Sales Manager I | Grade 11, $36,888 + Commission/Yr. | Gun, Midwest Region, Elementary Marketing | Lexington, Massachusetts | R. Clausen | 8/1/80 - (51) | No | VRIF | 9/30/82 | Alleged Forced Retirement |
| Sylvestri, Michael** | 11/10/69 - (34) | 13 Yrs, 1 Mo. | Senior Mfg. Engineer | Grade 9, $37,812/Yr. | RMG, NAMD, New Build Operations | Webster, New York | P. Urichel | N/A | No | IRIF | 12/13/82 | IRIF Termination |
| Aldrich, Roy | 2/16/78 - (54) | 4 Yrs, 7 Mos. | Mfg. Supervisor II | Grade 7, $29,688/Yr. | Diablo, Manufacturing MPD | Hayward, California | J. Phoenix | N/A | No | IRIF | 9/13/82 | IRIF Termination; Alleged Demotion |
| Abadin, Harold | 4/7/69 - (31) | 15 Yrs, 5 Mos. ± | Sr. Customer Service Rep. | Grade 26, $27,690 | BSG, NY Uptown Branch | New York, New York | D. P. Smith | N/A | Yes | Active During Class Period | 9/20/84 | Alleged Denial of Promotion† |
| Burtell, Joseph | 11/24/69 (43) | 13 Yrs, 7 Mos. | Mfg. Engineer I | Grade 8 - $36,300/Yr. | RMG, NAMD, Commodity Management Operations | Webster, New York | M. Wortbecki | 3/1/81 - (34) | No | VRIF | 6/30/83 | Alleged Forced Resignation*** |
| Bentley, John | 2/4/64 - (29) | 18 Yrs, 10 Mos. | Material Planner | Grade 10, $27,170/Yr. | RMG, NAMD, Components Manufacturing Operations | Webster, New York | E. McDonald, M. LeBlanc | N/A | No | IRIF | 12/13/82 | IRIF Termination |
| Borrell, Robert | 11/15/71 - (42) | 10 Yrs, 9 Mos. | Mfg. Program Manager | Grade 13, $61,992/Yr. | RBG, Mid-Volume Strategic Business Unit | Webster, New York | R. Holcomb | N/A | No | IRIF | 8/16/82 | IRIF Termination |
| Brown, George | 7/3/67 - (42) | 16 Yrs, 10 Mos. | Associate Editor, "Current Events" | Grade 6, $37,275/Yr. | XEP - Middletown | Middletown, Connecticut | C. Paddock | 4/1/73 - (47) | No | Retirement | 4/27/84 | Alleged Forced Resignation; Alleged Demotion*** |

| Name | Date - (Age) | Tenure | Job Title | Grade, Salary | Department/Division | Location | Manager | Dates | Yes/No | Status | Date | Claim |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canlet, Angelina | 3/23/71 - (29) | 15 Yrs, 3 Mos.; As of 6/1/86 | Buyer II | Grade 7, $30,350/Yr. | Diablo, Mechanical Procurement | Fremont, California | R. Zoetz | 1/5/80 - (18), 7/1/82 (42); 10/1/83 - (44) | No | Active Employee | N/A | Denial of Promotion |
| Castellanos, Nestor | 11/19/62 - (27) Rehire 8/1/79 - (44) | 14 Yrs, 2 Mos; 5 Yrs, 7 Mos. | Sr. Customer Service Rep | Grade 2A, $23,896/Yr. | BSG, Austin Branch Service | Midland, Texas | B. Railto | N/A | No | Active During Class Period | 5/3/85 | Denial of Promotion |
| Clark, Sally | 5/14/79 - (36) | 4 Yrs. | Sr. Customer Service Rep. | Grade 2A, $20,696/Yr. | BSG, Information Systems Division, Seattle Branch Service | Tukwila, Washington | S. Onoo | 11/10/80 - (31) | Yes | Terminated; Unsatisfactory Performance | 5/6/83 | Termination*** |
| Courtemanche, Dorothy | 2/14/77 - (47 Yrs. 11 Mos.) | 5 Yrs, 11 Mos. | XRC Senior Administrative Clerk | Grade 7, $17,466/Yr. | BSG, Xerox Reproduction Center - Miami | Miami, Florida | F. Sweet | 10/6/80 - (51) | Yes | Terminated; Unsatisfactory Performance | 1/3/83 | Termination |
| Damon, James | 4/17/67 - (35) | 15 Yrs, 4 Mos. | Technical Specialist/ Project Manager III | Grade 10, $46,884/Yr. | RBG, Electronics Division, Components Engineering | Henrietta, New York | R. Fox | 5/1/72 - (40) | No | IRIF | 8/16/82 | IRIF Termination |
| Devoe, Gloria | 3/6/67 - (42) | 19 Yrs, 3 Mos. ± As of 6/1/86 | Designer, Electronic Design Services | Grade 7, $31,416/Yr. | RBG, Electronics Division, Printing Systems Group | El Segundo, California | D. Boehler | 4/14/80 - (55) | No | Active Employee | N/A | Alleged Demotion |
| Draught, Karen | 6/1/79 - (39) | 2 Yrs, 5 Mos. | Sr. Mkt. Support Specialist | Grade 5, $20,180/Yr. | OPD, Midwest Region, Mktg. Supp. Dept. | Minneapolis, Minnesota | J. Smith | N/A | Yes | IRIF | 11/10/81 | Alleged Denial of Promotion; IRIF Termination |
| Evans, Albert | 8/4/47 - (23) | 33 Yrs, 3 Mos. | Field Engineer | Grade 7, $32,500/Yr. | BSG, Cheshire, Field Engineering Dept., Nat'l Service Dept., Marketing, Special Business Division | Meadeen, Illinois | M. Chrusciews | 1/1/80 - (55) | No | VRIF | 11/1/82 | Alleged Forced Retirement |
| Faber, Virginia | 8/10/81 - (40) | 5 Yrs, 10 Mos. ± As of 6/1/86 | Sr. Credit Representative | Grade 7, $22,022/Yr. | BSG, San Fernando Service Branch | San Fernando, California | J. Rohn | 12/12/83 - (43) | Yes | Active Employee | N/A | Alleged Denial of Promotion |
| French, Jane | 5/12/80 - (43) | 6 Yrs. ± As of 6/1/86 | Credit Representative | Grade 6, $17,765/Yr. | BSG, Houston District Control | Houston, Texas | S. Barnes | 6/15/81 - (69); 6/14/82 - (50) | Yes | Active Employee | N/A | Alleged Denial of Promotion |
| Gerds, William | 9/3/68 - (19 Yrs. 5 Mos.) | 14 Yrs, 2 Mos. | Field Service Manager | Grade 9, $38,856/Yr. | BSG, San Francisco Region, Oakland Service Branch | Oakland, California | J. Credit; B. Mitchell | N/A | Yes | VRIF | 11/1/82 | Alleged Forced Retirement |
| Gottell, John | 12/29/81 - (43) | 1 Yr, 5 Mos. | Claims Supervisor | Grade 20, $23,189/Yr. | C&F, U.S. Insurance Group, Milwaukee Branch | Milwaukee, Wisconsin | R. Solis | N/A | Yes | Terminated; Unacceptable Performance | 5/20/83 | Termination*** |
| Haley, William | 6/27/66 - (26) | 16 Yrs, 5 Mos. | Senior Mfg. Engineer | Grade 9, $36,012/Yr. | RMG, NAMD, New Build Operation | Webster, New York | W. Hamilton | N/A | No | IRIF | 12/10/82 | IRIF Termination |
| Haughan, Richard | 8/11/69 - (34) | 16 Yrs, 10 Mos ± As of 6/1/86 | Systems Product Leader I | Grade 11, $57,461/Yr. | BSG, Service Systems | Henrietta, New York | R. Waskowski | N/A | No | Active Employee | N/A | Alleged Denial of Promotion |
| Hagan, Raymond | 6/5/67 - (37) | 15 Yrs, 1 Mo. | Community Affairs Rep. | Grade 99, $38,000/Yr. | C&F, U.S. Insurance Group, Pub. & Comm. Affairs | Basking Ridge, New Jersey | R. Mulholland | 1978 - (48) | No | IRIF | 7/23/82 | Termination*** |
| Hurwitz, Stephen | 10/28/68 - (27) | 13 Yrs, 8 Mos. ± | Manager Credit | Grade 10, $42,348/Yr. | Diablo, Finance/Credit Collection | Hayward, California | D. Heinze | 2/1/79 - (37) | No | Permitted Resignation | 5/15/82 | Alleged Denial of Promotion; Alleged Forced Resignation† |
| Jones, Donald | 11/14/77 - (35) | 7 Yrs. ± | Sr. Marketing Rep. | Grade 20, $22,353/Yr. | C&F, U.S. Insurance Group, Orlando Branch | Orlando, Florida | L. Sammons | N/A | Yes | Resigned Before Probable Discharge | 6/22/84 | Alleged Resignation*** † |
| Keaney, John | 5/27/63 - (34) | 18 Yrs, 6 Mos. | Product Manager Copier/Duplicators | Grade 13, $54,416/Yr. | BSG, Information Systems Division | Rochester, New York | W. Samuelson | N/A | No | IRIF | 1/11/82 | Alleged Forced Retirement |
| Koppelis, Sylvia | 9/5/72 - (55 Yrs. 11 Mos.) | 9 Yrs. | Chief Switchboard Operator | Grade 5, $14,768/Yr. | BSG, Office Services Group, Central New Jersey Administration | Morris Plains, New Jersey | J. Papandrea | N/A | No | Normal Retirement Age And Insufficient Service (Disability Exhausted) | 9/30/81 | Alleged Forced Retirement |
| LaRue, Roger | 4/16/62 - (38) | 23 Yrs, 3 Mos. | Personnel Planning Mgr. | Grade 11, $67,500/Yr. | Corporate, Personnel | Stamford, Connecticut | C. Euzfeld | 1/1/77 - (54) | Yes | Active During Class Period | 10/1/85 | Alleged Denial of Promotion; Alleged Forced Demotion |
| Leva, John | 3/4/74 - (34) | 8 Yrs, 9 Mos. | Document Distribution Sr. Telephone Sales Rep. | Grade 5, $18,804 + Commissions/Yr. | OPD, Telemarketing | Dallas, Texas | K. Kawski-Sabonis | 1/1/82 - (42) | Yes | IRIF | 12/15/82 | IRIF Termination |

| Name | Hire Date - (Age) | Service | Job Title | Grade/Salary | Department | Location | Supervisor | Date - (Age) | | Separation Reason | Date | Allegation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Luchete, Robert | 5/3/71 - (33) | 12 Yrs. | Sr. Customer Service Rep. | Grade 26, $24,700/Yr. | BSG, Akron Branch Service | Akron, Ohio | L. Gleason | N/A | Yes | Termination; Unsatisfactory Performance | 5/27/83 | Termination*** |
| Martin, Larry | 12/1/69 - (28) | 12 Yrs., 11 Mos. | Principal Marketing Consultant | Grade 11, $48,540/Yr. | OPD, Office Systems Mktg., Marketing Services | Dallas, Texas | N. Suckley | N/A | No | IRIF | 11/15/82 | Alleged Denial of Promotion; IRIF Termination |
| McLean, Garnell | 10/15/73 - (44) | 9 Yrs. ± | Senior Technical Representative | Grade 3, $28,002/Yr. | BSG, Information Systems Division, Field Service Unit, Bergen Branch Service | Oradell (Bergen County), New Jersey | J. Hecker | N/A | Yes | VRIF | 11/1/82 | Alleged Forced Retirement |
| Mihn, Raymond | 1/26/70 - (31) | 11 Yrs., 6 Mos. | Manager, Customer Administration Systems Architecture | Grade 14, $33,504/Yr. | Corporate Customer Administration | Stamford, Connecticut | R. Henderson | 3/1/80 - (40) | No | Voluntary - Accept or Seek Other Employment | 8/1/81 | Alleged Forced Resignation |
| Mongovi, Daniel | 11/7/71 - (39 Yrs., 9 Mos.) | 11 Yrs., 8 Mos. | Senior National Account Manager | Grade 11, $49,965/Yr. | BSG, Major Accounts - Sales | New York, New York | S. E. Goy | 5/1/82 - (50) | Yes | Voluntary - Accept or Seek Other Employment | 7/15/83 | Alleged Forced Resignation; Denial of Promotion*** |
| Murry, Diane | 4/7/80 - (39) | 4 Yrs., 1 Mo. | Information Systems Marketing Rep. II | Grade 7, $20,280 + Commission/Yr. | BSG, Dallas Sales District | Dallas, Texas | S. Beal | 10/1/81 - (40) | Yes | Involuntary Separation - Flagrant Disregard Of Company Interests | 4/30/84 | Alleged Denial Of Territorial Assignment*** |
| Okamoto, William | 6/18/79 - (44 Yrs., 9 Mos.) | 2 Yrs., 6 Mos. | Quality Engineer III | Grade 7, $27,170/Yr. | XEOS, Quality Assurance Dept. | Pomona, California | R. Wick | N/A | No | VRIF | 12/11/81 | Alleged Forced Resignation |
| Pausch, Gene | 9/23/66 - (24) | 17 Yrs., 6 Mos. | Market Support Coordinator | Grade 7, $37,726/Yr. | BSG, Memphis District Sales | Memphis, Tennessee | D. Cottrell | N/A | Yes | Voluntary - Accept or Seek Other Employment | 4/30/84 | Alleged Demotion; Alleged Forced Resignation*** |
| Pires, Mary Jean | 8/21/72 - (33) | 9 Yrs., 11 Mos. | Branch Manager - Sales | Grade 14, $54,756/Yr. | BSG, Business Products Division, Branch Sales | Dallas, Texas | R. Shanley | 1/1/81 - (41) | Yes | Permitted Resignation | 7/23/82 | Alleged Demotion; Alleged Forced Resignation |
| Purcell, Steven | 11/23/70 - (36) | 11 Yrs., 10 Mos. | Mgr., Latinamerican Group Technical Operations | Grade 16, $77,184/Yr | XLG, Manufacturing Department | Rochester, New York | R. Rehbopf | 8/1/80 - (45) | No | IRIF | 10/1/82 | IRIF Termination |
| Rhoten, Sara | 4/7/80 - (40 Yrs., 11 Mos.) | 7 Mos. | Marketing Support Specialist | Ungraded, $16,000/Yr. | Kurzweil, Sales/Marketing Department | Cambridge, Massachusetts | B. Shapiro | N/A | N/A | IRIF | 10/21/80 | IRIF Termination |
| Rubin, Stanley | 2/4/69 - (27) | 14 Yrs. | Computer Operator III | Grade 8, $22,438/Yr. | GSD, West Coast Operations, Computer Operations Dept. | El Segundo, California | L. Dodge | N/A | Yes | Permitted Resignation | 1/21/83 | Alleged Forced Resignation |
| Schechinger, Dennis | 9/4/69 - (27) | 14 Yrs., 5 Mos. | Sr. Customer Service Rep. | Grade 26, $31,018/Yr. | BSG, Long Beach Service District | Long Beach, California | Q. Adams | N/A | Yes | Voluntary Separation - Job Dissatisfaction | 2/10/84 | Alleged Resignation*** |
| Scott, Leonard | 3/7/67 - (30) | 15 Yrs., 9 Mos. | Corporate Truck Scheduler | Grade 9, $27,456/Yr. | RMG, NAMD, New Build Operations | Webster, New York | J. Herzog | N/A | No | IRIF | 12/13/82 | IRIF Termination |
| Simonsgaard, Ronald | 6/1/66 - (27) | 15 Yrs., 8 Mos. | Account Executive | Grade 10, $41,856 + Commission/Yr. | BSG, Information Systems Division, Phoenix Branch - Sales | Phoenix, Arizona | Unknown | N/A | No | Voluntary - Accept or Seek Other Employment | 1/29/82 | Alleged Forced Resignation |
| Snow, Suzanne | 3/1/82 - (18) | 2 Yrs., 1 Mo. ± | Expeditor II | Grade 6, $16,016/Yr. | Diablo, Mechanical Procurement | Hayward, California | J. Reynolds | 7/1/83 - (19) | No | Voluntary Separation - Job Dissatisfaction | 4/2/84 | Alleged Forced Resignation*** |
| Steiner, John | 5/6/63 - (33) | 21 Yrs., 7 Mos. | Sr Customer Service Rep. | Grade 26, $43,914/Yr. | BSG, Long Beach District Service | Long Beach, California | L. Hayen | N/A | No | Voluntary - Accept or Seek Other Employment | 12/5/84 | Alleged Demotion; Alleged Forced Resignation*** |
| Terrell, William | 11/9/70 - (44) | 11 Yrs., 9 Mos. | Mfg. Supervisor II | Grade 7, $21,888/Yr. | RMG, NAMD, New Build Operations | Webster, New York | W. R. White | N/A | Yes | VRIF | 8/27/82 | Alleged Forced Retirement |
| Towse, Joy | 11/22/76 - (47) | 5 Yrs. | Marketing Analyst | Grade 7, $23,040 | XLG, Marketing Department | Greenwich, Connecticut | P. Cascano | 7/1/80 (51) | No | IRIF | 11/10/81 | IRIF Termination |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vanderwort, Donna | 2/9/76 - (46) | 6 Yrs., 4 Mos. ± | Technician III | Grade 7, $20,930/Yr. | RBG, Low Volume SBU | Webster, New York | W. Doyle | 9/11/78 - (48) | No | VRIF | 6/11/82 | Alleged Forced Resignation |
| Walker, James | 5/13/63 - (31) | 18 Yrs., 9 Mos. | Senior Technical Representative | Grade 3, $26,442/Yr | BSG, Old Dominion Branch Service | Arlington, Virginia | P. Clark | N/A | Yes | Voluntary - Accept or Seek Other Employment | 3/1/82 | Alleged Denial of Promotions, Alleged Forced Resignation † |
| Weikley, James | 6/1/70 - (29) | 11 Yrs., 7 Mos. | Mfg. Material Analyst II | Grade 7, $28,584/Yr. | RMG, NAMD, Component Manufacturing Operations | Webster, New York | G. Stonewell | N/A | No | VRIF | 1/4/82 | Alleged Forced Resignation |
| Wilson, Robert | 9/11/67 - (30) | 13 Yrs., 7 Mos. | Manager, Fulfillment | Grade 10, $28,560/Yr. | R. R. Bowler Co., Fulfillment Department | Ann Arbor, Michigan | E. Prokopak | 6/1/80 - (43) | Yes | Permitted Resignation | 3/30/81 (Effective 6/30/81) | Alleged Forced Resignation |
| ...oung, Donald | 1/10/72 - (38) | 10 Yrs., 6 Mos ± | Project Manager I | Grade 12, $38,464/Yr. | RBG, Engineering Operations Department | Henrietta, New York | J. Brogan | 11/1/76 - (43) | No | IRIF | 7/1/82 | IRIF Termination, Alleged Demotion |

## APPENDIX B

| Age | Sample Group Members | Salary | Sample Group Members |
|---|---|---|---|
| 40–45 | 24 | $10,000–$20,000 | 6 |
| 46–50 | 17 | $20,001–$30,000 | 26 |
| 51–55 | 15 | $30,001–$40,000 | 14 |
| 56–60 | 6 | $40,001–$50,000 | 7 |
| 61–65 | 2 | $50,001–$60,000 | 8 |
| 65–70 | 0 | $60,001–$70,000 | 2 |
|  |  | $70,001–$80,000 | 1 |

| Organization[1] | Sample Group Members |
|---|---|
| Business Systems Groups | 23 |
| Reprographics Manufacturing Group | 9 |
| Office Products Division | 7 |
| Reprographics Business Corp. | 6 |
| Diablo | 4 |
| Crumm & Forster | 3 |
| XLG | 2 |
| GSD | 1 |
| Corporate Audit & Operational Analysis | 1 |
| Corporate OGC | 1 |
| Ginn & Co. | 1 |
| XEP | 1 |
| Corporate Personnel | 1 |
| Corporate Customer Administration | 1 |
| Electro-Optical Systems | 1 |
| Kurzweil | 1 |
| R. R. Bowker & Co. | 1 |

[1] Without reference to region, district, or department.

Sample Group Members by Geographic Location

| New York | (25) | | California | (11) |
|---|---|---|---|---|
| New York | 3 | | Hayward | 3 |
| Henrietta | 3 | | El Saqundo | 2 |
| Webster | 12 | | Long Beach | 2 |
| Woodbury | 1 | | Pomona | 1 |
| Rochester | 6 | | San Fernando | 1 |
| | | | Fremont | 1 |
| Texas | (6) | | Oakland | 1 |
| Dallas | 4 | | | |
| Houston | 1 | | Connecticut | (5) |
| Midland | 1 | | Stamford | 2 |
| | | | Greenwich | 2 |
| New Jersey | (4) | | Middletown | 1 |
| Morris Plains | 2 | | | |
| Basking Ridge | 1 | | Massachusetts | (2) |
| Oradell | 1 | | Cambridge | 1 |
| | | | Lexington | 1 |
| Florida | (2) | | | |
| Miami | 1 | | Michigan | (1) |
| Orlando | 1 | | Ann Arbor | 1 |
| | | | | |
| Virginia | (1) | | Arizona | (1) |
| Arlington | 1 | | Phoenix | 1 |
| | | | | |
| Tennessee | (1) | | Washington | (1) |
| Memphis | 1 | | Tukwila | 1 |
| | | | | |
| Minnesota | (1) | | Illinois | (1) |
| Minneapolis | 1 | | Mundelein | 1 |
| | | | | |
| Wisconsin | (1) | | Ohio | (1) |
| Milwaukee | 1 | | Akron | 1 |